## Wethersfield Board of Education *v.* Connecticut State Board of Labor Relations et al. (12748)

Peters, C. J., Healey, Shea, Dannehy and Cioffi, Js.

Argued November 12—decision released December 30, 1986

*John C. Ferguson,* for the appellant (defendant Wethersfield Federation of Teachers).

*Lisa B. Bingham,* with whom, on the brief, was *William O. Riiska,* for the appellee (plaintiff).

*Patrice A. McCarthy,* for the Connecticut Association of Boards of Education, as amicus curiae.

*J. Larry Foy, William S. Zeman* and *Joel M. Ellis* filed a brief for the Connecticut State Board of Labor Relations et al. as amicus curiae.

PETERS, C. J. The sole issue in this appeal is whether the Teacher Evaluation Act in General Statutes § 10-151b makes proposals concerning the procedures that govern teacher evaluations a mandatory subject of collective bargaining between a local school board and a local teachers' union. The plaintiff, Wethersfield Board of Education, successfully appealed, in the trial court, a declaratory ruling of the Connecticut State Board of Labor Relations requiring the board to bargain about proposals concerning teacher evaluation procedures tendered by the defendant, Wethersfield Federation of Teachers. The defendant has appealed to this court from the judgment of the trial court. We find no error.[1]

The case has been tried on stipulated facts. The plaintiff, Wethersfield Board of Education (hereinafter school board), as the duly constituted board of education for the town of Wethersfield, is an employer within the meaning of the Teacher Negotiation Act, General Statutes § 10-153a et seq. The defendant, Wethersfield Federation of Teachers (hereinafter federation), represents the certified professional employees of the school board in the teachers' unit defined in the act. When these proceedings were initiated, the parties were engaged in bargaining for a successor collective bargaining agreement.[2]

---

[1] The Connecticut State Board of Labor Relations was a named defendant in the trial court. In this court, the board elected to file an amicus brief supporting the appeal of the defendant union rather than itself taking an appeal. We attach no significance to this distinction, and have considered fully the arguments in each of the amicus briefs.

[2] The stipulated facts do not indicate the expiration date of the existing collective bargaining agreement, or, for that matter, what has happened to the negotiation of a successor agreement. In the petition seeking declaratory relief from the labor board, the parties indicated that statutory dates for mediation and for binding arbitration would have occurred late in 1982. The school board filed its petition with the labor board on November 4, 1982, and the labor board announced its decision and order on May 31, 1983. The school board's appeal to the Superior Court, dated June 14, 1983, was

The collective bargaining agreement that was in force in 1982 established procedures for the evaluation of teachers. Its provisions entitled each teacher to a written copy of each evaluation, and to the right to discuss his evaluation with his evaluator. They also permitted a teacher to file a grievance concerning an unfavorable evaluation, but only on the grounds of bad faith or discrimination. Finally, in a provision that the school board proposed to eliminate, an advisory committee was designated to suggest improvements in the evaluation form to the superintendent of schools.[3]

In the process of bargaining for a new contract, the federation proffered ten new proposals for procedures to govern teacher evaluation. The school board agreed to negotiate about the first of these proposals, which provided that a teacher's rebuttal of an evaluation must accompany the evaluation contained in the teacher's

---

delayed by the labor board's failure to certify the administrative record until August 3, 1984. Although this record puts into question the continuing nature of the bargaining process that we are today adjudicating, we will assume that this controversy is not moot because it raises an important question of statutory construction which is " 'capable of repetition, yet evading review.' " *Shays* v. *Local Grievance Committee,* 197 Conn. 566, 572, 499 A.2d 1158 (1985). The issue of collective bargaining over teacher evaluations not only affects an ongoing part of the state's program for education but is likely to arise again in future labor negotiations between the parties to this lawsuit. In these circumstances, we have jurisdiction to address the merits of this appeal.

[3] The operative collective bargaining agreement in 1982 contained the following provisions on the subject of teacher evaluations:

"9.2.1 Each teacher shall receive a written copy of each evaluation.

"9.2.2 Any teacher shall have the right to discuss his evaluation with his evaluator.

"9.2.3 A teacher may appeal an adverse evaluation through the grievance procedure, but only on the grounds of bad faith or discrimination.

"9.2.4 A committee composed of members of the E.A.W. shall be convened to propose change, modifications and/or revisions of the evaluation form to the Superintendent of Schools."

Both parties are willing to negotiate over §§ 9.2.1 through 9.2.3. Neither party proposes the inclusion of § 9.2.4 in the successor collective bargaining agreement.

personnel file. The school board has, however, refused to bargain about the federation's remaining proposals which would, inter alia, require prior consultation before evaluations, permit unlimited grievances, and preclude classroom observations by anyone other than a certified administrator.[4]

---

[4] The federation has proposed that a separate article 10 entitled "Evaluation of Teachers" replace the present §§ 9.2.1 through 9.2.4. The proposed terms of article 10 would provide:

"10.2.1 Each teacher shall be given a written copy of any evaluation and shall be permitted to discuss it with the superintendent or his designee. Teacher's written rebuttal to an evaluation must accompany the evaluation in teacher's personnel file.

"10.2.2 The parties agree that the evaluation of each teacher's performance, including observations, shall be conducted openly and with full knowledge of the teacher. Tenured teachers shall be observed no more than once per year.

"10.2.3 The evaluator will prepare for classroom observations by conferring or communicating with the teacher before the classroom observation concerning the purposes of the classroom activity or lesson to be observed and/or the particular emphasis of the observation. At the request of either the teacher or the evaluator, a pre-conference will be held.

"10.2.4 A teacher shall have the opportunity to review and discuss the evaluation reports with [his] supervisors and to review the contents of the personnel file maintained by building principals, supervisors, or the superintendent.

"10.2.5 A teacher may appeal an adverse evaluation through the grievance procedure.

"10.2.6 A teacher shall be provided with a copy of the evaluation report at least three (3) school days prior to a post-evaluation conference with [his] principal and/or supervisor. The written evaluation will be forthcoming within five (5) days after observation.

"10.2.7 Only certified administrators shall be permitted to observe or evaluate teachers.

"10.2.8 Under the extended plan of evaluation any classroom observation(s) and evaluations must be directly related to the performance objectives agreed upon by both teacher and evaluator.

"10.2.9 All previous secret evaluations shall be removed from all teachers' personnel files.

"10.2.10 Any classroom visitation by any administrator shall be considered an observation subject to all provisions contained above."

Both parties are willing to negotiate over § 10.2.1. The school board refuses to negotiate the provisions of §§ 10.2.2 through 10.2.10. These latter provisions, according to the school board, are not mandatory subjects of collective bargaining.

In its declaratory ruling, the State Board of Labor Relations (hereinafter labor board) ruled only on those proposals of the federation that it determined would relate to the procedures to be used in evaluating teachers within the unit. The labor board expressly declined to rule on whether the substantive standards to be used in teacher evaluations are mandatory or permissive subjects of collective bargaining, and requested supplemental briefs concerning the federation's proposal to permit teachers to appeal adverse evaluations through the grievance process. With these limitations, the labor board ruled that the remaining federation proposals were mandatory subjects of collective bargaining because they related directly to teacher job security. This conclusion was, according to the labor board, bolstered by the language of General Statutes § 10-151b which permits local boards of education and teachers' representatives to supplement, "by mutual agreement," state guidelines for the evaluation of teachers.

The trial court decided, contrary to the reasoning of the labor board, that, in enacting a revised § 10-151b in 1974, the legislature had excluded the subject of teacher evaluation guidelines from mandatory bargaining. Relying on a textual change in the wording of the statute, which substituted "mutual agreement" for "negotiation" as the operative method for arriving at local guidelines for teacher evaluation, the court held that the legislature had effectively removed the subject of teacher evaluations from the negotiation process. The court concluded that the present controversy was governed by the specific provisions of § 10-151b, rather than by the more general mandate of § 10-153a on which the labor board had primarily focused its attention. The court further concluded that the federation's proposals, although limited to procedures, infringed upon the school board's managerial author-

ity to evaluate the teachers it employs in accordance with existing statutory law. Accordingly, the court reversed the decision of the labor board.

The federation in its appeal to this court claims that the trial court erred in each of its conclusions of law. The federation's written brief attacks the trial court's rulings that: (1) § 10-151b removes the subject of teacher evaluation guidelines from the scope of mandatory bargaining; (2) teacher evaluation procedures are not subject to mandatory bargaining, despite the fact that they relate, as the labor board held, to conditions of employment; and (3) the federation's proposals for teacher evaluation procedures infringe upon the school board's statutory authority to evaluate the teachers it employs. At oral argument, however, the federation agreed that the dispositive question is one of statutory construction. Does § 10-151b make it mandatory or permissive for the parties engaged in collective bargaining to negotiate about teacher evaluations? Like the trial court, we interpret § 10-151b to make such bargaining permissive rather than mandatory.

Our interpretation of the meaning and scope of § 10-151b takes place within well defined limits. "The fundamental objective of statutory construction is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern this intent, we look to the words of the statute itself . . . to the legislative history and circumstances surrounding the enactment of the statute . . . to legislative practice and policy . . . and to judicial construction." *State* v. *Kozlowski,* 199 Conn. 667, 673–74, 509 A.2d 20 (1986), and cases cited therein.

Section 10-151b is part of what is commonly referred to as the Teacher Evaluation Act. As first enacted, in 1973, it provided, in subsection (c), that teacher evaluations "shall be based upon minimum performance

criteria established by the state board of education and such additional performance criteria as the local or regional board of education may, *by negotiation,* establish." (Emphasis added.) Public Acts 1973, No. 73-456, § 1. A year later the statute was amended to its present form. Public Acts 1974, No. 74-278, § 1. It continues to provide for locally adopted supplements to state prescribed baseline criteria for teacher evaluations, but it defines the process for arriving at such supplemental criteria differently. As reenacted, § 10-151b now states, in subsection (a), that there shall be continuous teacher evaluations "in accordance with guidelines established by the state board of education for the development of evaluation programs *and such other guidelines as may be established by mutual agreement* between the local or regional board of education and the teachers' representative chosen pursuant to section 10-153b . . . ." (Emphasis added.)

Despite this change in the text of § 10-151b, the federation, and the labor board as amicus, argue that the revised statute does not remove procedures for teacher evaluation from the ambit of mandatory bargaining for three reasons. First, they maintain that the statute's use of the permissive "may be established" has no implications for the collective bargaining process. Second, they contend that the phrase "by mutual agreement" does not prescribe permissive bargaining as the manner in which the parties might reach a final agreement about supplemental evaluation guidelines.[5] Third, they assert that this court should defer to the labor board's construction of the statute because that agency is

---

[5] We note that the labor board's decision made a distinction between bargaining about evaluation guidelines themselves and bargaining about procedures for teacher evaluations. The labor board expressly declined to rule on whether the substantive standards for teacher evaluations are a mandatory subject of collective bargaining. In this court, neither the federation nor the labor board, in its amicus brief, has pursued this distinction.

charged with the administration and enforcement of our labor laws. We will examine each of these arguments separately.

We agree with the federation and the labor board that § 10-151b does not forbid mandatory bargaining about teacher evaluations merely because it states that supplemental evaluation guidelines "may be established" by local school boards and teachers' representatives. The statute makes it clear that such guidelines must comply with baselines established by the state board of education. If the legislature had amended the 1973 act to provide, in 1974, that supplemental guidelines "may be established" by negotiation, the federation and the labor board would have had a strong argument that teacher evaluations are a subject of mandatory bargaining.

As actually amended, however, § 10-151b provides that, after 1974, local supplements to state standards for teacher evaluations would be established not by "negotiation" but by "mutual agreement." This is the crucial change upon which the trial court relied in its judgment. Notably, the labor board's decision discussed the statute in its 1974 version without commenting on the inferences to be drawn from that version's departures from the 1973 act.

The federation and the labor board would have us read "mutual agreement" as a virtual synonym for "negotiation." They maintain that a legislature intending to remove teacher evaluations from the scope of mandatory collective bargaining would not have relied upon so ambiguous a phrase as "mutual agreement," especially when the legislature simultaneously added an express statutory reference to "the teacher's representative chosen pursuant to section 10-153b." Instead, they claim that the phrase was probably inserted to prohibit unilateral establishment of sup-

plemental evaluation procedures by local boards when bargaining has reached a final impasse. We are not persuaded by this proffered analysis of what "mutual agreement" means.

Although the meaning of "mutual agreement" is not free from inherent ambiguity, we have, in this case, numerous indicia of what the legislature intended by the use of these words. We must ascribe substantive significance to the legislature's act of amending § 10-151b to replace "negotiation" with "mutual agreement." *State* v. *Baker,* 195 Conn. 598, 601–602, 498 A.2d 1041 (1985); *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.,* 193 Conn. 208, 232, 477 A.2d 988 (1984). In the law of labor relations, the term "negotiations" has a special meaning because, in one or another of its cognate forms, it is frequently associated with statutory instructions about collective bargaining. See, e.g., General Statutes §§ 1-18a (b), 5-271, 5-272, 5-278, 7-273j, 7-468 (c), 7-473b, 7-474, 7-477, 10-153a, 10-153b, 10-153d, 10-153g, 31-48b (d); 31-101 (8); 31-111b (a); 31-112(c). As this court noted in *West Hartford Education Assn., Inc.* v. *DeCourcy,* 162 Conn. 566, 576–77, 295 A.2d 526 (1972), when § 10-153d (b) speaks of a "duty to negotiate with respect to salaries and other conditions of employment" of teachers, that statute defines the scope of mandatory collective bargaining. It is therefore reasonable to conclude that, in deleting "negotiation" and substituting "mutual agreement," the legislature manifested an intent to remove teacher evaluations from the ambit of mandatory collective bargaining.

Our interpretation is supported by the legislative history of the 1974 amendment. The recorded proceedings in both houses of the general assembly demonstrate that the legislature's substitution of "mutual agreement" for "negotiation" was a conscious decision to make a substantive change in the process for estab-

lishing teacher evaluation criteria. Several speakers commented expressly and affirmatively on the merits of this change.[6] In reply to a question, a sponsor emphasized that the act's implementation, on a local level, would depend upon the ability of interested parties to "come to a mutual agreement."[7] Others noted that the amended act had received broad based support from diverse interested parties, including both school boards and unions, and attributed this support to the fact that every affected group would enjoy a veto power.[8] These

[6] Commenting on this bill, Representative Phyllis T. Kipp said: "This bill directs Superintendents of Schools to make evaluations of teachers based on guidelines which have been established by the State Board of Education for development of evaluation programs and upon any additional guidelines as may be established by mutual agreement. This is a change from last year in the Fair Dismissal Law . . . whereby we did add negotiation. It is now by mutual agreement. I think this is a very good change." 17 H.R. Proc., Pt. 10, 1974 Sess., p. 4739.

In the upper house, Senator Ruth O. Truex noted: "The circle will remember that a year ago we passed the bill mandating teacher evaluation in the state of Connecticut. It was a bill which had some controversial sections largely to one which said, which required that guidelines criteria established by the State Board of Education could be increased and acted upon by negotiation with the Board of Education and local teacher's organizations. This caused some concern in the minds of many people that we were opening up teacher evaluation to the negotiation process. . . . Amendments to the old bill have been introduced which . . . [make] [t]his bill, I think . . . a very good move. . . . [I]t eliminates the section of by negotiation which I'm sure will please practically everyone here." 17 S. Proc., Pt. 6, Spec. Sess., June, 1974, p. 2260.

[7] When Representative Bernard L. Avcollie asked: "What happens if there is no agreement on guidelines to be used for evaluation?" Representative Phyllis T. Kipp replied: "Quite briefly, Mr. Avcollie, after you're sitting with all these groups, one of the reasons we came to the phrase 'mutual agreement' was that it was decided in Committee by all these particular people that they could, indeed, come to a mutual agreement." 17 H.R. Proc., Pt. 10, 1974 Sess., p. 4741.

[8] Representative Howard M. Klebanoff expressed skepticism about whether the revised act would succeed in its mission, commenting: "This is a change from a bill we passed last time, and one of the reasons we have total unification of all the groups supporting this is because every group has a veto power, and when you're saying there will be something estab-

expressions of legislative intent are utterly inconsistent with a construction of "mutual agreement" that subjects local additions to state promulgated evaluation criteria to mandatory collective bargaining.

The federation and the labor board suggest that the fact of the unions' support for enactment of the amended § 10-151b cannot be reconciled with any diminution in union bargaining power over evaluation guidelines. Before the 1974 amendment, however, unions lacked the power to prevent school boards from unilaterally promulgating evaluation criteria if negotiations on this subject had reached an impasse after exhaustion of good faith bargaining. Under the amended § 10-151b, in the absence of mutual agreement, the only operative guidelines are those promulgated by the state board of education. The unions' new ability to prevent unilateral imposition of additional local evaluation criteria may well account for their support of the amended statute.

Legislative action subsequent to enactment of the amended § 10-151b lends further support to our conclusion that, after 1974, teacher evaluations were no longer a subject of mandatory collective bargaining. Although § 10-151b itself has not again been amended in any manner relative to the present dispute,[9] two

---

lished by mutual agreement . . . yes, it's a nice thing for all the groups to support, because any group that's not happy can just refuse to agree, and you're deadlocked." 17 H.R. Proc., Pt. 10, 1974 Sess., p. 4744.

Representative William A. Bevacqua, commenting favorably on the legislation, emphasized that "for the first time in the deliberations . . . concerning the problem of teacher evaluation, there is, currently, an expression of unanimity in terms of the various groups that have to come together . . . . [T]he various and sundry groups that are concerned . . . do have veto power in terms of determining what the specific criteria will be . . . ." 17 H.R. Proc., Pt. 10, 1974 Sess., p. 4746.

[9] The legislature in 1978 amended General Statutes § 10-151b (a) by substituting "local or regional board of education" for "school district" following "The superintendent of each," and "local" for "town" following

important changes in our education law, in 1979 and in 1986, shed further light on the legislature's intentions.

In 1979, the legislature amended the Teacher Negotiation Act by adding a new section to provide for mediation and binding arbitration if school boards and teachers' unions are unable to resolve irreconcilable differences about a new collective bargaining agreement. General Statutes § 10-153f. The new statute describes, as the predicate for these mandatory processes, a failure of agreement "after negotiation concerning the terms and conditions of employment applicable to the employees in such unit . . . ." General Statutes § 10-153f (b). This choice of language confirms the 1974 distinction between subjects of negotiation, to which binding arbitration applies, and other topics of discussion which fall outside these special procedures.

Even more significantly, the General Assembly in 1986 enacted a new education enhancement act containing numerous provisions for career incentives and teacher evaluation. Public Acts 1986, Spec. Sess., May, 1986, No. 86-1, §§ 11 through 19. These provisions underscore that bargaining about teacher evaluations is permissive. The new act, in § 13 (a), authorizes the creation of an "evaluation development panel" that "shall develop a local teacher evaluation plan to meet the requirements of this act and the regulations adopted [pursuant thereto] . . . . [An approved] local teacher evaluation plan . . . shall be deemed to meet all of the requirements of section 10-151b of the general stat-

"agreement between the" and "evaluations to the." Several amendments to § 10-151b (b), in 1977, 1978 and 1982, apparently made minor verbal changes in the description and the timing of teacher evaluation programs. Public Acts 1977, No. 77-27, § 3; Public Acts 1978, No. 78-218, § 101; Public Acts 1982, No. 82-74, § 1. Neither the parties nor the amici in this case have suggested that any of these amendments shed any light on the present controversy.

utes."[10] The new act stipulates, in § 13 (b),[11] that a local teacher evaluation plan must be approved by a newly created commission on career incentives and teacher evaluation, whose membership, as prescribed in § 11, includes two representatives of public school teachers.[12]

---

[10] Public Acts, Spec. Sess., May, 1986, No. 86-1, § 13 (a), provides: "(a) Each evaluation development panel formed pursuant to section 12 of this act shall develop a local teacher evaluation plan to meet the requirements of this act and of the regulations adopted under the provisions of subsection (e) of section 11 of this act. In developing such a plan, such a panel may use the assistance of the consultants retained pursuant to the provisions of subsection (b) of section 11 of this act. A local teacher evaluation plan developed pursuant to this section and approved pursuant to subsection (c) of this section shall be deemed to meet all of the requirements of section 10-151b of the general statutes."

[11] Public Acts, Spec. Sess., May, 1986, No. 86-1, § 13 (b), provides: "(b) Each such plan shall be submitted to the local or regional board of education for approval and shall be submitted by the school district to the commission not later than April 1, 1988."

[12] Public Acts, Spec. Sess., May, 1986, No. 86-1, § 11 (a), provides: "(a) During the period commencing on the effective date of this act and ending on June 30, 1988, there shall be a commission on career incentives and teacher evaluation which shall be composed of: Three persons appointed by the governor, one of whom shall be a representative of the higher education community with knowledge of teacher education, one of whom shall be representative of public school teachers with knowledge of personnel evaluation, and one of whom shall be a representative-at-large; three persons appointed by the president pro tempore of the senate, one of whom shall be a representative of boards of education, one of whom shall be a representative of public school teachers, and one of whom shall be a representative-at-large; one person appointed by the majority leader of the senate, who shall be a member of the business community; three persons appointed by the speaker of the house of representatives, one of whom shall be a representative of school administrators with knowledge of personnel evaluation, one of whom shall be a member of the business community, and one of whom shall be a representative of the legal community with knowledge of public sector collective bargaining; one person appointed by the majority leader of the house of representatives, who shall be a member of the business community with knowledge of personnel evaluation; one person appointed by the minority leader of the senate, who shall be a representative of boards of education with knowledge of personnel evaluation; one person appointed by the minority leader of the house of representatives, who shall be a representative of school administrators; the senate chairman and ranking member of the joint standing committee of the general assembly having cognizance of the matters [relating] to education; and

The legislature would not have delegated to a new commission the responsibility for approval of a local teacher evaluation plan if the criteria for such a plan were the subject of mandatory collective bargaining between local school boards and teachers' unions. There would have been no need to provide teacher representation on the new commission if teachers, through their bargaining representative, already had a major voice in the negotiation of local teacher evaluation guidelines.

We recognize that in construing § 10-151b as we have, we are departing from our usual rule of according deference to the construction given a statute by the labor board, the agency principally charged with its enforcement. *Connecticut State Board of Labor Relations* v. *Board of Education,* 177 Conn. 68, 74, 411 A.2d 28 (1979); *Anderson* v. *Ludgin,* 175 Conn. 545, 555, 400 A.2d 712 (1978). In this case, a departure from this rule is warranted for three reasons.

First, the issue of statutory construction in this case does not involve the application of open ended statutory language to a particular fact bound controversy, but rather concerns an issue of law about the scope of a Connecticut statute that this court has not previously interpreted. " 'Although the factual and discretionary determinations of administrative agencies are to be given considerable weight by the courts . . . it is for the courts, and not for administrative agencies,

the house of representatives chairman and ranking member of the joint standing committee of the general assembly having cognizance of matters relating to education; and the commissioners of education and higher education as ex-officio, nonvoting members. The members of the commission shall be appointed not later than July 1, 1986. The membership of the commission shall select one of its members to serve as chairman. Notwithstanding the provisions of section 4-1a of the general statutes, the terms of the members of the commission shall expire on June 30, 1988. The commission may employ a secretary, a clerk, and within its budget, such other employees as it deems necessary."

to expound and apply governing principles of law.'"
*Wilson* v. *Freedom of Information Commission,* 181
Conn. 324, 342–43, 435 A.2d 353 (1980), and cases cited
therein; see also *Real Estate Listing Service, Inc.* v.
*Real Estate Commission,* 179 Conn. 128, 138–39, 425
A.2d 581 (1979).

Second, neither the administrative record nor the
administrative decision indicates that the labor board
had before it the legislative history of § 10-151b or
the subsequent legislative enactments on which we
have relied in our construction of the statute. The labor
board focused, in large part, on the general balancing
test that would normally determine whether a partic-
ular issue is a matter of managerial prerogative and
educational policy, under § 10-153a and *West Hartford
Board of Education Assn., Inc.* v. *DeCourcy,* supra. We
have focused, instead, on the operative terms of a stat-
ute that removed this issue from the general ambit of
§ 10-153a.

Third, the construction that we adopt bears the
imprimatur of the State Department of Education,
another state agency with relevant expertise concern-
ing the statute at hand. A State Department of Educa-
tion guidebook published in 1978, before the enactment
of binding arbitration, recommended "that teacher
evaluation not be included as an issue in the collective
bargaining of teacher contracts." A. Carrano, Teacher
Evaluation: A Guidebook for Connecticut School Dis-
tricts (1978) p. 16.

In these circumstances, we do not consider ourselves
bound, in this case, to follow the labor board's construc-
tion of § 10-151b. We conclude, as did the trial court,
that teacher evaluations are not a mandatory subject
of collective bargaining because the legislature, in
enacting a revised § 10-151b in 1974, determined that
state evaluation guidelines would govern teacher evalu-

ations unless local school boards and teachers' representatives decided, "by mutual agreement," to implement supplemental local guidelines. The effect of the enactment of the revised § 10-151b was to permit a local school board—or a teachers' representative—to refuse to negotiate about the subject of teacher evaluations. The trial court was correct in sustaining the school board's appeal from the contrary ruling of the labor board on this ground.[13]

There is no error.

In this opinion the other justices concurred.

---

[13] Since we conclude that the action of the plaintiff board was justified by General Statutes § 10-151b as we have construed it, we need not review the trial court's alternate ruling that, even under the balancing test of General Statutes § 10-153a, collective bargaining was not mandatory because the federation's proposals in this case infringed upon the school board's managerial authority to evaluate teachers in accordance with statutory law.