QUINNIPIAC COUNCIL, BOY SCOUTS OF AMERICA, INC. *v.* COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES ET AL.
(12981)
(12982)

PETERS, C. J., HEALEY, SHEA, CALLAHAN and MORAGHAN, Js.

Argued April 8—decision released July 7, 1987

*Susan H. Bartholomew,* with whom, on the brief, were *Alice S. Miskimin,* and *Michael Quinn* and *Richard A. Duncan,* legal interns, for the appellant (defendant Catherine Pollard).

*Arnold B. Feigin,* assistant attorney general, with whom were *Barney Lapp* and *Richard T. Sponzo,* assistant attorneys general, and, on the brief, *Joseph I. Lieberman,* attorney general, for the appellant (named defendant).

*George A. Davidson,* pro hac vice, with whom were *Linda Trummer-Napolitano,* pro hac vice, and *James F. Stapleton,* for the appellee (plaintiff).

PETERS, C. J. The dispositive issue in this case is whether the refusal to permit a woman to serve as a scoutmaster for a Boy Scout troop is a violation of our public accommodation statute, General Statutes (Rev. to 1977) § 53-35 (a).[1] As a result of a complaint filed

---

[1] General Statutes (Rev. to 1977) § 53-35 (a) provides: "DISCRIMINATION IN PUBLIC ACCOMMODATIONS, RENTAL HOUSING, COMMERCIAL PROPERTY, SALE OF BUILDING LOTS AND MOBILE HOME PARKS. (a) All persons within the jurisdiction of this state shall be entitled to full and equal accommodations in every place of public accommodation, resort or amusement, subject only to the conditions and limitations established by law and applica-

by the defendant Catherine Pollard, the defendant Commission on Human Rights and Opportunities (CHRO) decided, after a hearing, that the plaintiff, Quinnipiac Council, Boy Scouts of America, Inc., was statutorily obligated to offer Pollard a position as scoutmaster.[2] On appeal by the plaintiff, the trial court found

ble alike to all persons; and any denial of such accommodation by reason of race, creed, color, national origin, ancestry, sex, marital status, age or physical disability, including, but not limited to, blindness or deafness of the applicant therefor shall be a violation of the provisions of this section. Any discrimination, segregation or separation, on account of race, creed, color, national origin, ancestry, sex, marital status or physical disability, including, but not limited to, blindness or deafness shall be a violation of this section. A place of public accommodation, resort or amusement within the meaning of this section means any establishment, which caters or offers its services or facilities or goods to the general public including, but not limited to, public housing projects and all other forms of publicly assisted housing, and further including any housing accommodation, commercial property or building lot, on which it is intended that a housing accommodation or commercial building will be constructed, offered for sale or rent, and mobile home parks as defined in section 21-64, provided the provisions of this section shall not apply (1) to the rental of a housing accommodation in a building which contains housing accommodations for not more than two families living independently of each other, if the owner or members of his family reside in one of such housing accommodations, or (2) to the rental of a room or rooms in a housing accommodation, if such rental is by the occupant of the housing accommodation, or by the owner of the housing accommodation and he or members of his family reside in such housing accommodation. The provisions of this section, with respect to the prohibition of sex discrimination, shall not apply to the rental of sleeping accommodations provided by associations and organizations which rent all such sleeping accommodations on a temporary or permanent basis for the exclusive use of persons of the same sex. The provisions of this section, with respect to the prohibition of discrimination on the basis of marital status, shall not be construed to prohibit the denial of housing accommodations to a man and a woman who are unrelated by blood or who are not married to each other. The provisions of this section, with respect to the prohibition of discrimination on the basis of age, shall not apply to minors, to federal or state aided or municipal housing for elderly persons or to privately owned housing developed and maintained exclusively for persons within specified age groups."

That section has now been recodified, without substantive change, as General Statutes §§ 46a-64 (a) (1) and 46a-63 (a).

[2] The hearing examiner of the Commission on Human Rights and Opportunities issued the following order:

the CHRO ruling erroneous. Consequently, the trial court's judgment nullified the CHRO order in its entirety. Pollard and the CHRO have appealed to this court from that adverse judgment. We find no error.

The trial court accepted, without qualification, the facts as they had been found by the CHRO. The defendant Catherine Pollard requested, first in 1974, and again in 1976, that she be appointed scoutmaster of Boy Scout troop 13 in Milford. Pollard had had a long history of active involvement in scouting, as a merit badge counselor, a cub scout den mother, and as a troop 13 committee member. In this latter capacity, she had acted as de facto scoutmaster for troop 13 when it lacked a functioning scoutmaster and an assistant scoutmaster during the years 1972 to 1976. Under her direction, the scouts in troop 13 had made satisfactory progress through the established boy scout organizational structure, with five boys having attained the rank of eagle scout. Nonetheless, Pollard's application to be scoutmaster was turned down because of the policy of the Boy Scouts of America that scoutmasters be men

"It is hereby ORDERED that the Respondent QUINNIPIAC COUNCIL offer a commission as Scoutmaster of a Boy Scout Troop in the Town of Milford to the Complainant CATHERINE POLLARD. If more than one such Scoutmaster vacancy exists in the Town of Milford, the Complainant may have her choice of troops. In the event that no Milford troop is in need of a Scoutmaster, then the Respondent shall offer CATHERINE POLLARD each Scoutmaster vacancy within the same district or a contiguous district as it occurs, until such time as the Complainant accepts such assignment or an opening within the Town of Milford arises which shall be offered to her forthwith. In the event of illness, vacation, or other circumstance temporarily hindering the Complainant from accepting such position as Scoutmaster on a timely basis, she shall be given at least three such opportunities to be commissioned as Scoutmaster for a Milford Boy Scout troop, which opportunities shall be extended over a minimum time period of one year. "QUINNIPIAC COUNCIL of the Boy Scouts of America henceforth shall omit the qualification that commissioned Scoutmasters must be male.

"HEARING TRIBUNAL
By: Helen Z. Pearl
Hearing Examiner"

at least 21 years of age.[3] Although the official policy statement of the Boy Scouts of America imposes no gender qualification for employment, and encourages women to undertake many volunteer leadership roles, the national organization does not permit women to serve in certain designated volunteer positions: scoutmaster, assistant scoutmaster, webelos den leader, assistant webelos den leader, and lone scout friend and counselor. The plaintiff rejected Pollard's application solely because of this national policy without making any judgment whatsoever about her individual qualifications to perform the duties required of a scoutmaster.

Nonetheless, the trial court rejected the conclusion of the hearing examiner that the plaintiff violated § 53-35 (a) when it refused to consider the merits of Pollard's application to be a scoutmaster. The court first reviewed the history of legislative expansion of the concept of a "place of public accommodation" to implement the legislative policy of protecting individual rights at any establishment which caters or offers its services or facilities or goods to the general public. The broad concept of "establishment," the court determined, was intended to encompass "every possible type of business establishment imaginable" but not "a singular, unique, eleemosynary institution" like the Boy Scouts of America. Furthermore, in applying the statute to the circumstances of this case, the court concluded that it had to determine whether a gender limitation for the position of scoutmaster "is an 'accommodation' under our Connecticut statute." The court held that it was not, both because the plaintiff is not a "place of public accommodation" and because the position of scoutmaster does not fall within the rubric of "services," "goods" or "facilities" and hence is not

[3] The plaintiff, Quinnipiac Council, is a so-called "local council" which is chartered by the National Council of the Boy Scouts of America to serve the south central portion of the state of Connecticut.

a "public accommodation." Accordingly, the court sustained the plaintiff's appeal and rendered judgment setting aside the order of the hearing examiner of the defendant commission.

The appeals filed by the defendants raise three issues arising out of the trial court's interpretation and application of § 53-35 (a). These issues are whether the trial court erred in concluding that: (1) the plaintiff is excluded from the category of a "place of public accommodation" because it has no fixed physical situs; (2) the plaintiff's refusal to offer Pollard a position as scoutmaster was not a discriminatory accommodation practice; and (3) the plaintiff's overall policy did not manifest gender discrimination because scouting invites women to assume many important leadership positions other than the one for which Pollard applied. Although we disagree with the trial court on the first of these issues, we find no error on the second and hence need not reach the third.

I

In our determination of the merits of the defendants' appeals, it is important to identify, at the outset, what is and what is not at issue. The central question before us is whether the defendants can sustain their *statutory* claim that § 53-35 (a), our public accommodation statute, forbids the plaintiff from denying to Pollard, because of her gender, the opportunity to serve the plaintiff as a scoutmaster. The defendants have not purported to raise any constitutional claims of gender discrimination, either under the due process or equal protection provisions of the state or the federal constitution, or under the equal rights amendment to the state constitution.[4] Although the plaintiff has asserted grounds alternate to the statute as justification for its

---

[4] See U.S. Const., amend XIV; Conn. Const., art. I, §§ 8, 20.

denial of a scoutmaster position to Pollard,[5] its principal arguments flow from its reading of the statute itself. Notably, the plaintiff has not claimed that its refusal to consider Pollard's application falls within the exceptions listed in the statute, nor does it claim to have established a "bona fide occupational qualification or need"[6] to limit the position of scoutmaster to men over the age of 21. The issue for us to resolve, therefore, is whether § 53-35 (a) encompasses a claim of discrimination under the facts found by the defendant commission.

---

[5] Alternatively, the plaintiff argues that the application of our public accommodation law to an organization such as the Boy Scouts of America violates the right to freedom of association under our federal and state constitutions; U.S. Const., amend. I; Conn. Const., art. I, § 14; and violates the supremacy clause of the federal constitution. U.S. Const., art. IV, cl. 2. Although we need not reach those constitutional issues today, we note that those arguments have little merit in light of the United States Supreme Court's recent decisions in *Roberts* v. *United States Jaycees,* 468 U.S. 609, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984), and *Board of Directors of Rotary International* v. *Rotary Club of Duarte,* 481 U.S.    , 107 S. Ct. 1940, 95 L. Ed. 2d 474 (1987). In both cases, the United States Supreme Court held that even if a public accommodation law infringes slightly on the constitutional rights of expressive association, that infringement is justified because such statutes serve a compelling state interest in eliminating discrimination. *Board of Directors of Rotary International* v. *Rotary Club of Duarte,* supra, 1948; *Roberts* v. *United States Jaycees,* supra, 624; see *Buckley* v. *Valeo,* 424 U.S. 1, 25, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976).

The plaintiff also challenges the authority of the defendant commission to interpret our public accommodation law through the adjudication of individual cases. It maintains that by interpreting the statute to apply to the plaintiff, the commission was in fact promulgating a regulation, as defined in the Uniform Administrative Procedure Act, General Statutes § 4-166 (7), and circumventing the detailed statutory procedures for the adoption of regulations by administrative agencies. See General Statutes § 4-168 (a). Contrary to the plaintiff's claim, however, the commission has authority to interpret statutory law through the adjudication process. *Connecticut Life & Health Ins. Guaranty Assn.* v. *Jackson,* 173 Conn. 352, 356, 377 A.2d 1099 (1977).

[6] No such qualification is expressly provided in General Statutes § 53-35 (a).

It is a discriminatory accommodation practice, under § 53-35 (a), to deny any person within the jurisdiction of this state "full and equal accommodations in every place of public accommodation, resort or amusement . . . by reason of . . . sex . . . ." The phrase "place of public accommodation, resort or amusement" is itself defined "within the meaning of this section [as] any establishment, which caters or offers its services or facilities or goods to the general public, including, but not limited to, public housing projects and all other forms of publicly assisted housing, any housing accommodation, commercial property or building lot, on which it is intended that a housing accommodation or commercial building will be constructed or offered for sale or rent, and mobile home parks . . . ." General Statutes § 53-35 (a). Violation of this section may give rise to penal sanctions as well as to civil remedies ordered as a result of administrative proceedings before the defendant commission. General Statutes §§ 53-35 (d), 53-36, 53-36a.[7]

In deciding whether § 53-35 (a) makes a gender based refusal to consider an application for scoutmaster a discriminatory public accommodation practice, we operate under well established principles of statutory construction designed to assist us in ascertaining and giving effect to the apparent intent of the legislature. "If the language of a statute is plain and unambiguous, we need not look beyond the statute because we assume that the language expresses the intention of the legislature. *Rhodes* v. *Hartford*, [201 Conn. 89, 93, 513 A.2d 124 (1986)]; *Johnson* v. *Manson*, 196 Conn. 309, 316, 493 A.2d 846 (1985), cert. denied, 474 U.S. 1063, 106 S. Ct. 813, 88 L. Ed. 2d 787 (1986); *Mazur* v. *Blum*, 184 Conn. 116, 118–19, 441 A.2d 65 (1981). When we are faced with ambiguity in a statute, however, we turn for interpretive guidance to its legisla-

---

[7] These statutes providing for civil remedies and penal sanctions have been recodified as General Statutes §§ 46a-64 (c), 46a-86, 46a-91.

tive history, the circumstances surrounding its enactment, and the purpose the statute is to serve. *Rhodes* v. *Hartford,* supra; *State* v. *Kozlowski,* [199 Conn. 667, 673, 509 A.2d 20 (1986)]; *State* v. *Ellis,* 197 Conn. 436, 445, 497 A.2d 974 (1985)." *State* v. *Blasko,* 202 Conn. 541, 553, 522 A.2d (1987); see also 2A J. Sutherland, Statutory Construction (4th Ed. Sands 1984) § 45.05.

Our construction of § 53-35 (a) confronts us with a question of law in which an administrative decision interpreting the statute is not afforded special deference. Such deference is unwarranted when the question is the construction of a statute on an issue that has not previously been subjected to judicial scrutiny. *Schlumberger Technology Corporation* v. *Dubno,* 202 Conn. 412, 423, 521 A.2d 569 (1987); *Board of Education* v. *Board of Labor Relations,* 201 Conn. 685, 698–99, 519 A.2d 41 (1986); *Wilson* v. *Freedom of Information Commission,* 181 Conn. 324, 342–43, 435 A.2d 353 (1980).[8]

## II

We first address the question whether § 53-35 (a), in any and all circumstances, entirely excludes the Boy Scouts of America. The plaintiff urges us to hold that the concept of "*place* of public accommodation" necessarily involves a specific physical site and hence automatically excludes its organization from the coverage of the statute. Contrary to the conclusions of the hearing examiner of the defendant commission, the trial court resolved this question in favor of the plaintiff. We agree with the hearing examiner.

The statute, in § 53-35 (a), defines a "place of public accommodation" as "any establishment, which . . .

---

[8] The present case does not involve an administrative regulation that has been approved by the legislative review committee under General Statutes § 4-170. See *Phelps Dodge Copper Products Co.* v. *Groppo,* 204 Conn. 122, 129–30, 527 A.2d 672 (1987), and cases cited therein.

offers its services . . . ." The legislature has itself
linked its definition of "place" not with a site, but rather
with "any establishment." The meaning of this link-
age is sufficiently ambiguous on its face to require us
to look further to determine what the legislature
intended to encompass within its prohibition of dis-
criminatory accommodation practices.

Inquiry into the statute's legislative history makes
it exceedingly doubtful that linkage to a physical site
is a necessary element of the present definition of a
"place of public accommodation." Public accommoda-
tion statutes in general have their origins in the com-
mon law duties of innkeepers and common carriers to
offer their services to the general public without dis-
crimination. J. Story, Bailments (1846) §§ 466a, 470,
476 (2); W. Jones, Bailments (1828) § 94c; note, "Dis-
crimination in Access to Public Places: A Survey of
State and Federal Public Accommodations Laws," 7
N.Y.U. Rev. L. & Soc. Change 215, 217–18 (1978); M.
Tobriner & J. Grodin, "The Individual and the Public
Service Enterprise in the New Industrial State," 55
Cal. L. Rev. 1247, 1249–50 (1967). In Connecticut, as
the trial court correctly observed, our public accommo-
dation statutes have repeatedly been amended to
expand the categories of enterprises that are covered
and the conduct that is deemed discriminatory.

Prior to 1953, our public accommodation statute pro-
scribed discrimination at any "place of public accom-
modation" defined to include a specific list of
enterprises offering food, lodging, transportation or
entertainment to the general public. General Statutes
(Sup. 1949) § 691a. For present purposes, it bears not-
ing that discrimination on railroad cars was then
expressly forbidden, without regard to the absence of
a fixed "place" for locating a potential source of dis-
crimination. In 1953, the legislature abandoned its laun-
dry list approach when it substituted the general defi-
nition of "place of public accommodation" that is the

precursor of the present statute. That year the definition came to be, as it remains today, "any establishment which caters or offers its services or facilities or goods to the general public." General Statutes (Sup. 1953) § 2464 (c).

In order to draw appropriate implications from this legislative history we must consider the remedial purpose that the public accommodation statute was designed to implement. *Barco Auto Leasing Corporation* v. *House,* 202 Conn. 106, 116, 520 A.2d 162 (1987); *Rhodes* v. *Hartford,* supra, 95; *Borzencki* v. *Estate of Stakum,* 195 Conn. 368, 383, 489 A.2d 341 (1985). As the Supreme Court of the United States has only recently reiterated, "public accommodation laws 'plainly serve compelling state interests of the highest order.' [*Roberts* v. *United States Jaycees,* 468 U.S. 609, 624, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984)]." *Board of Directors of Rotary International* v. *Rotary Club of Duarte,* 481 U.S. , 107 S. Ct. 1940, 1948, 95 L. Ed. 2d 474 (1987). Among the compelling interests that such statutes serve is the state's interest in eliminating discrimination against women. Id.; *Buckley* v. *Valeo,* 424 U.S. 1, 25, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976); see *Evening Sentinel* v. *National Organization for Women,* 168 Conn. 26, 34, 357 A.2d 498 (1975).

In conjunction, the unconditional language of the statute, the history of its steadily expanded coverage, and the compelling interest in eliminating discriminatory public accommodation practices persuade us that physical situs is not today an essential element of our public accommodation law. Like Minnesota's similarly broadly drafted public accommodation statute,[9] whose

---

[9] Minnesota Statutes (1986) § 363.03 (3) provides in part: "It is an unfair discriminatory practice: To deny any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation because of race, color, creed, religion, disability, national original or sex." A "place of public accommodation" is defined as a "business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind, whether licensed or not,

comprehensive applicability was recognized in *United States Jaycees* v. *McClure,* 305 N.W.2d 764 (Minn. 1981), and held to be constitutional in *Roberts* v. *United States Jaycees,* supra, our statute now regulates the discriminatory conduct and not the discriminatory situs of an enterprise which offers its services to the general public.

### III

Our conclusion that our public accommodation statute does not automatically exclude the plaintiff from coverage because it does not have a fixed physical situs does not, however, end our inquiry. The next question that we must address is whether its conduct in denying Pollard an opportunity to become a scoutmaster was a discriminatory public accommodation practice. We hold that it was not.

In the decision of whether a discriminatory public accommodation practice has occurred, the determinative issue is whether an "establishment" that serves "the general public" has denied access to its goods and services to a member of a protected class. General Statutes § 53-35 (a). Despite the plaintiff's argument to the contrary, it is not, as a matter of law, dispositive for the resolution of this issue that the allegedly discriminatory "establishment" is a private rather than a business or commercial enterprise. Unlike the statutes in some other jurisdictions, our statute does not expressly limit its coverage to "business enterprises" nor does it expressly exclude private clubs or organizations.[10]

---

whose goods, services, facilities, privileges, advantages or accommodations are extended, offered, sold, or otherwise made available to the public." Minn. Stat. (1986) § 363.01 (18).

[10] For example, the scope of the California public accommodation law is expressly limited to "business establishments." Cal. Civil Code Ann. (Deering 1971 & Sup. 1987) § 51. Other jurisdictions have narrowed the scope of their public accommodation laws by expressly exempting any institution "which is in its nature distinctly private." See, e.g., D.C. Code (1981 & Sup. 1986) § 1-2502 (24); N.J. Stat. Ann. (1976 & Sup. 1986) § 10:1-5; N.Y. Exec. Law (McKinney 1982 & Sup. 1987) § 292 (9); Or. Rev. Stat. Ann. (1983) § 30.675 (2).

We can discern no reason to interpolate a "business" limitation into the legislature's unadorned reference to "any establishment." Like the question of situs, the question of coverage must reflect the legislative purpose of eliminating discriminatory conduct by those who serve the general public. From that vantage point, the organizational status of the enterprise that is the service provider cannot be the determinant of statutory coverage. A hospital, for example, cannot refuse its services to a member of the general public simply because the hospital is a nonprofit corporation. See *Rotary Club of Duarte* v. *Board of Directors of Rotary International,* 178 Cal. App. 3d 1035, 1051, 224 Cal. Rptr. 213 (1986), aff'd, 481 U.S. , 107 S. Ct. 1940, 95 L. Ed. 2d 474 (1987); *O'Connor* v. *Village Green Owners,* 33 Cal. 3d 790, 796, 662 P.2d 427, 191 Cal. Rptr. 320 (1983); see also *Connecticut Bank & Trust Co.* v. *Johnson Memorial Hospital,* 30 Conn. Sup. 1, 11, 294 A.2d 586 (1972). Similarly, a private university that opens its theater facilities for the entertainment of the general public cannot refuse admission for reasons of race or sex or other grounds made illegal by § 53-35 (a). Although no private organization is duty-bound to offer its services and facilities to all comers, once such an organization has determined to eschew selectivity, under our statute it may not discriminate among the general public. This construction accords with that of other courts in our sister states construing similar legislation. *Kiwanis International* v. *Ridgewood Kiwanis Club,* 806 F.2d 468, 473 (3d Cir. 1986); *Rotary Club of Duarte* v. *Board of Directors of Rotary International,* supra, 1058–59; *United States Jaycees* v. *McClure,* supra, 770–71; *National Organization of Women* v. *Little League Baseball,* 127 N.J. Super. 522, 531, 318 A.2d 33, aff'd, 67 N.J. 320, 338 A.2d 198 (1974); see also *Tillman* v. *Wheaton-Haven Recreation Assn., Inc.,* 410 U.S. 431, 438, 93 S. Ct. 1090, 35 L. Ed. 2d 403 (1973).

We therefore conclude that our legislature, in enacting § 53-35 (a), did not make a categorical judgment that only commercial and business establishments fall within the ambit of our public accommodation law. Instead, coverage under the statute depends, in each case, upon the extent to which a particular establishment has maintained a private relationship with its own constituency or a general relationship with the public at large. So viewed, the question of coverage is a question not of law but of fact.

It is entirely consistent with the underlying law governing discriminatory practices to inquire into specific circumstances to determine whether a complainant has established a discriminatory denial of accommodations. All of our antidiscrimination law is essentially fact-bound. As the Supreme Court of the United States has frequently reminded us, and as we have repeatedly stated in our own opinions, the *individual* is the focal point of the legislation that defines and prohibits discriminatory practices. The purpose of antidiscrimination legislation is to afford access to opportunity on the basis of individual abilities rather than on the basis of stereotypical generalizations. *Los Angeles Department of Water & Power* v. *Manhart,* 435 U.S. 702, 708, 98 S. Ct. 1370, 55 L. Ed. 2d 657 (1978); *Wroblewski* v. *Lexington Gardens, Inc.,* 188 Conn. 44, 59, 448 A.2d 801 (1982); *Connecticut Institute for the Blind* v. *Commission on Human Rights & Opportunities,* 176 Conn. 88, 96, 405 A.2d 618 (1978); *Evening Sentinel* v. *National Organization for Women,* supra, 35. In considering the opportunity of which an individual claims to have been deprived, the focus is equally on the particular opportunity, the particular position, rather than on access to an organization or an industry as a whole. *Trans World Airlines, Inc.* v. *Thurston,* 469 U.S. 111, 122–23, 105 S. Ct. 613, 83 L. Ed. 2d 523 (1985). The corollary to these well established principles is that a person seek-

ing recovery for discriminatory practices must demonstrate that he or she has personally been deprived of access to goods or services or positions in a manner forbidden by the statute governing access to public accommodations.

The issue in this case therefore is whether the record sustains Pollard's claim that she has personally been deprived of a public accommodation when she was denied the opportunity to become a scoutmaster. We do not decide today whether the plaintiff, for some purpose other than the one presently at issue, may be found to be an establishment that "caters or offers its services or facilities or goods to the general public." We need only determine whether, with respect to the specific position of scoutmaster, the defendants have proven that Pollard was denied access to an "accommodation" within the terms of § 53-35 (a). We conclude that the record does not sustain such a claim.

It is important to note the precise claim that the defendants advance. They maintain that Pollard was denied access to an "accommodation" because the plaintiff denied her the opportunity *to be of service* to the plaintiff. This claim raises an issue of first impression not only in this state but apparently in the country as a whole.

We observe first that a statute that addresses a discriminatory denial of *access to goods and services* does not, on its face, incorporate an allegedly discriminatory refusal by an enterprise to avail itself of a claimant's desire to *offer services*. An examination of the terms and conditions of existing legislation governing related areas of the law reenforces the likelihood that the legislature intended to restrict the scope of discriminatory accommodation practices as defined by § 53-35 (a) to instances of *access to goods and services*. *Texaco Refining & Marketing Co.* v. *Commissioner*, 202

Conn. 583, 597, 522 A.2d 771(1987); *Dart & Bogue Co.* v. *Slosberg,* 202 Conn. 566, 573, 522 A.2d 763 (1987); *State* v. *West,* 192 Conn. 488, 494, 472 A.2d 775 (1984); *C. White & Son, Inc.* v. *Rocky Hill,* 181 Conn. 114, 123, 434 A.2d 949 (1980).

A review of our labor legislation discloses that our General Statutes treat employment discrimination separately from public accommodation discrimination. We deem it especially significant that only the former statute contains an express exception for a "bona fide occupational qualification or need." General Statutes § 46a-60 (6); see *Sullivan* v. *Board of Police Commissioners,* 196 Conn. 208, 211–12, 491 A.2d 1096 (1985); *Wroblewski* v. *Lexington Gardens, Inc.,* supra; *Connecticut Institute for the Blind* v. *Commission on Human Rights & Opportunities,* supra; *Evening Sentinel* v. *National Organization for Women,* supra. Such an exception would appear, prima facie, to be as relevant to voluntary services as it is to paid employment. It would provide a proper framework for determining whether the plaintiff and its parent organization are justified or misguided in their view that the desirability of male role models outweighs the value of the services that talented women might provide to the boy scouts.

Our public accommodation statute, § 53-35 (a), gives no indication that it was intended to encompass the proffer of services within its definition of discriminatory accommodation practices. The absence of a statutory exception for a "bona fide occupational qualification or need" in the text of § 53-35 (a) is more consistent with a legislative intent to leave such practices to be regulated by statutes that address employment discrimination rather than by statutes directed to discrimination in public accommodations. We therefore conclude that, in denying Catherine Pollard the opportunity to serve as scoutmaster of Boy Scout troop 13,

the plaintiff did not deprive her of an "accommodation" as that term is used in our public accommodation statute.[11]

There is no error.

In this opinion the other justices concurred.

--------

[11] We note that the present record does not substantiate, in any fashion, a claim of discriminatory denial of access to generally available "services or facilities or goods." Although the defendants allege that by denying Pollard the opportunity to serve as scoutmaster, the plaintiff deprived her of access to facilities, there is no finding that Pollard was ever excluded, for any reason, from any meeting place associated with scouting. It would indeed be surprising if, despite her status as a member of the troop committee, she would have been unwelcome to attend any troop meetings wherever they might be held. There is similarly nothing of record to substantiate that Pollard was ever deprived of access to services that the plaintiff made available to the general public. Although there is a finding that "[s]coutmasters and other adult volunteer leaders are encouraged to participate in nationally developed . . . group training courses," there is no correlative finding that Pollard was ever excluded from pursuit of any of these educational opportunities. Finally, none of these claims regarding access to services or facilities is buttressed by a factual showing that they were otherwise made available, unselectively, to members of the general public. To the extent that these opportunities would have been available only to those whom the plaintiff had accepted as scoutmasters, our discussion holding such voluntary employment to be outside the scope of a public "accommodation" would preclude finding a discriminatory accommodation practice on these grounds.