## SUSAN S. STARR *v.* COMMISSIONER OF ENVIRONMENTAL PROTECTION ET AL. (14529)

PETERS, C. J., CALLAHAN, BORDEN, BERDON, NORCOTT, KATZ, and SANTANIELLO, Js.[1]

[1] This case was orally argued on December 10, 1992, before a court of five justices consisting of Justices Callahan, Borden, Berdon, Norcott and Katz. The court subsequently determined that the case should be considered en banc. Pursuant to Practice Book § 4112, Chief Justice Peters and Justice Santaniello were added to the court and considered the case upon full review of the record, briefs and transcript of the oral argument, as well as briefs subsequently filed by amici curiae.

Argued December 10, 1992—decision released July 6, 1993

*John M. Looney,* assistant attorney general, with whom, on the brief, was *Richard Blumenthal,* attorney general, for the appellant (named defendant).

*Kathleen Eldergill,* for the appellee (plaintiff).

*Kevin C. Murphy* filed a brief for the Conservation and Environmental Quality Section of the Connecticut Bar Association as amicus curiae.

*Paul B. Edelberg, William Bouton III, Edward Samorajczyk, Alexander H. Schwartz* and *Kevin Ferrigno* filed a brief for the Banking Law Section of the Connecticut Bar Association as amicus curiae.

*Dean M. Cordiano* and *John R. Bashaw* filed a brief for the Connecticut Bankers Association et al. as amici curiae.

*Patrick W. Hanifan, William H. Narwold* and *Laura W. Ray* filed a brief for the New England Legal Foundations as amicus curiae.

CALLAHAN, J. This case concerns the issue of whether the owner of certain real estate, the plaintiff, Susan S. Starr, can be held liable pursuant to General Statutes § 22a-432,[2] to correct a condition on her land that can reasonably be expected to create a source of pollution to the waters of the state,[3] even though she did not create the condition, acquiesce in its creation, or even own the property when the condition was created.

In response to complaints by local residents voiced by the defendant Scantic Neighborhood Assocation, Inc., of noxious odors emanating from a 44.3 acre parcel of land owned by the plaintiff on Simon Road in Enfield, the defendant commissioner of environmental protection (defendant) in June, 1989, initiated an investigation to determine the source of the odors. The defendant's investigation, which lasted more than a year, revealed that in the past the plaintiff's property had been utilized by a now defunct trucking company for the disposal of solid wastes, including demolition debris and industrial waste from the Springfield Gas Company. The defendant determined that the materi-

---

[2] General Statutes § 22a-432 provides in relevant part: "If the commissioner finds that any person has established a facility or created a condition before or after June 25, 1985, or is maintaining any facility or condition which reasonably can be expected to create a source of pollution to the waters of the state, he may issue an order to such person to take the necessary steps to correct such potential source of pollution."

[3] General Statutes § 22a-423 defines "waters" as "all tidal waters, harbors, estuaries, rivers, brooks, watercourses, waterways, wells, springs, lakes, ponds, marshes, drainage systems, and all other surface or underground streams, bodies or accumulations of water, natural or artificial, public or private, which are contained within, flow through or border upon this state or any portion thereof."

als dumped on the plaintiff's land had polluted the site and continued to do so, creating a source of pollution to the waters of the state.

In July, 1990, the defendant issued an enforcement order to the plaintiff pursuant to General Statutes §§ 22a-432 and 22a-433.[4] In the order, the defendant stated that it had been found that materials present on the plaintiff's land evinced that the land had been used as a disposal site for solid waste. The order went on to assert that tests performed on samples of soil and water obtained from the plaintiff's property had identified a number of contaminants, including complex and amenable cyanides, heavy metals, and volatile and semivolatile hydrocarbons. On the basis of these findings, the defendant determined that the plaintiff had created or was maintaining a condition on her property that could reasonably be expected to create a source of pollution to the state's waters. Consequently, the plaintiff was ordered by the defendant to: "(1) Investigate the solid waste on site and the potential extent and degree of soil, surface and ground water pollution both on and off-site; (2) [t]o perform remedial actions approved by [the defendant] to abate soil, surface, and ground water pollution; and (3) [t]o conduct a monitoring program to determine the effectiveness of the remedial actions taken."

---

[4] General Statutes § 22a-433 provides in relevant part: "Whenever the commissioner issues an order to abate pollution to any person pursuant to the provisions of section 22a-430 or 22a-431, an order to correct potential sources of pollution pursuant to the provisions of section 22a-432 or an order to correct a violation of hazardous waste regulations pursuant to section 22a-449 and the commissioner finds that such person is not the owner of the land from which such source of pollution or potential source of pollution emanates, he may issue a like order to the owner of such land or shall send a certified copy of such order, by certified mail, return receipt requested, to the owner at his last-known post-office address, with a notice that such order will be filed on the land records in the town wherein the land is located. When the commissioner issues such an order to an owner, the owner and the person causing such pollution shall be jointly and severally responsible."

The plaintiff filed a timely appeal of the defendant's order pursuant to General Statutes § 22a-436.[5] An administrative hearing on the plaintiff's appeal was held on March 4 and March 11, 1991, before an adjudicator appointed by the defendant. Prior to the hearing, the parties entered into a stipulation of facts that was admitted into evidence and adopted by the defendant.[6] At the hearing, the following pertinent facts were therefore not in dispute: The plaintiff is the record owner of the 44.3 acre site in question. She took title to the property on January 30, 1987, by virtue of a fiduciary deed from the estate of her late husband. Materials present on the site indicated that in the past the site had been used for the disposal of solid waste that

[5] "[General Statutes] Sec. 22a-436. (Formerly Sec. 25-54o). HEARING ON ORDER TO ABATE. Each order to abate pollution issued under section 22a-428 or 22a-431 or decision to deny under subsection (b) or (c) of section 22a-430 shall be sent by certified mail, return receipt requested, to the subject of such order or decision to deny and shall be deemed issued upon deposit in the mail. Any person who or municipality which is aggrieved by any such order or decision to deny an application without prior hearing under subsection (b) of section 22a-430 may, within thirty days from the date such order or decision is sent, request a hearing before the commissioner. The commissioner shall not grant any request for a hearing at any time thereafter. After such hearing, the commissioner shall consider the facts presented to him by the person or municipality, including, but not limited to, technological feasibility, shall consider the rebuttal or other evidence presented to or by him, and shall then revise and resubmit the order to the person or municipality, or inform the person or municipality that the previous order has been affirmed and remains in effect. The request for a hearing as provided for in this section or a decision under subsection (b) of section 22a-430 made after a public hearing shall be a condition precedent to the taking of an appeal by the person or municipality under the provisions of section 22a-437. The commissioner may, after the hearing provided for in this section, or at any time after the issuance of his order, modify such order by agreement or extend the time schedule therefor if he deems such modification or extension advisable or necessary, and any such modification or extension shall be deemed to be a revision of an existing order and shall not constitute a new order. There shall be no hearing subsequent to or any appeal from any such modification or extension."

[6] The adjudicator and the commissioner will both be referred to as the defendant.

included demolition debris and industrial wastes. Tests of soil and water samples obtained from the property identified several contaminants including complex and amenable cyanide, metals, and volatile and semi-volatile hydrocarbons. It was further stipulated that the waste and contaminants located on the plaintiff's property constitute a condition that can reasonably be expected to create a source of pollution to the waters of the state, that the surface waters emanating from the site are polluted within the meaning of "pollution" as defined by § 22a-423, and that the wastes and contaminants on site have not been removed by the plaintiff.

The defendant, after the hearing, concluded that the measures ordered on July 9, 1990, were necessary to remove the potential sources of pollution from the plaintiff's land and confirmed the original order. The defendant's decision turned on the interpretation of the term "maintaining" as used in § 22a-432. In the memorandum of decision, the defendant stated: "The sole issue at this juncture is whether the respondent is, to use the precise statutory language, 'maintaining' that condition."[7] The defendant noted that the term "maintaining" is not defined in the statutes. Consequently, the defendant turned to the dictionary to determine its commonly approved usage. Referring to Webster's New International Dictionary, the defendant concluded that the term "maintaining," as used in the statute, meant "to hold or keep in a particular state or condition," that it entailed no element of scienter or requirement of positive action by the landowner, and that there was "no compelling reason" to read such a limiting condition into the statute's explicit language. The defendant supported that conclusion, and the propriety of the

[7] The plaintiff agreed that the outcome depended on whether the use of the word "maintaining" in General Statutes § 22a-432 was interpreted to require positive action by the landowner or whether passive ownership sufficed for liability.

order, by citing to a decision in a previous case in which it had been held that mere ownership of real property was a sufficient basis for imposing liability under § 22a-432.[8]

The plaintiff appealed the defendant's final decision to the Superior Court pursuant to §§ 22a-437 and 4-183.[9] On appeal, the court found that the plaintiff was aggrieved by the defendant's decision and had standing to appeal. It thereafter found, in addition to the facts set forth in the stipulation of the parties at the administrative hearing, that "there was considerable, indeed overwhelming evidence that the dumping of the

[8] The defendant cited *Final Decision in re Enforcement Order No. 681 issued to Phillip G. Andrews et al.* (February 5, 1991), wherein he had stated that the owners, "whether or not they caused the alleged pollution, could be found (under the doctrine of strict liability) to be maintaining" a condition that reasonably can be expected to create a source of pollution to the waters of the state.

[9] "[General Statutes] Sec. 22a-437. (Formerly Sec. 25-54p). APPEAL. (a) Any person who or municipality which is aggrieved by a decision under subsection (b) of section 22a-430 or by any order of the commissioner other than an order under section 22a-6b, to abate pollution, may, after a hearing by the commissioner as provided for in section 22a-436 or subsection (b) of section 22a-430, appeal from the final determination of the commissioner based on such hearing to the superior court as provided in chapter 54. Such appeal shall have precedence in the order of trial as provided in section 52-192.

"(b) Notwithstanding the provisions of any other statute to the contrary, any appeal by a person or municipality aggrieved by an order of the commissioner to abate pollution, other than an order under section 22a-6b, or by a decision under subsection (b) of section 22a-430, shall be pursuant to this section."

General Statutes § 4-183 provides in relevant part: "(a) A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the superior court as provided in this section. The filing of a petition for reconsideration is not a prerequisite to the filing of such an appeal.

"(b) A person may appeal a preliminary, procedural or intermediate agency action or ruling to the superior court if (1) it appears likely that the person will otherwise qualify under this chapter to appeal from the final agency action or ruling and (2) postponement of the appeal would result in an inadequate remedy."

pollutants occurred long before the plaintiff or her husband owned the property and the dumping was done by a now defunct trucking company which was hauling the material from gas producing companies in Massachusetts. Although the [defendant] made no findings of fact which specifically identified those responsible for the dumping of the pollutants, all of the evidence showed that it was not the plaintiff. There was also evidence, which was likewise uncontradicted, that the plaintiff was actually denied any access to the property from the time she acquired it until the summer of 1989, when the pollution was first noticed. This circumstance came about as a result of the town's control of the road leading into the property and its refusal to allow the plaintiff to use that road. The point of this evidence is that it shows that the plaintiff's ownership of the property was utterly passive up to the time the pollution was discovered."

The trial court noted that, at the administrative hearing, the defendant had admitted the evidence that indicated the plaintiff's lack of culpability for causing the pollution on her property, but had "essentially held that it was not relevant in assessing responsibility for the clean-up." The court also noted that the defendant had "implicitly conceded that the plaintiff had not 'established a facility or created a condition' causing the pollution" as set forth in § 22a-432, but had decided rather that the "mere passive ownership" of contaminated real property constituted " 'maintaining [a] facility or condition which reasonably can be expected to create a source of pollution' " under § 22a-432. The trial court concluded that the defendant had been incorrect in determining that "§§ 22a-432 and 22a-433 impose strict and full liability on the owner of the property for the elimination of pollution, regardless of the owner's 'innocence' in causing it and regardless of the culpability

of other persons."[10] The court, as did the defendant in the administrative hearing, found the dispositive issue to be "whether an owner of property on which pollutants were dumped by other persons prior to her acquisition of it, but who herself has had no active involvement with the property, not even to go on it to inspect it, is 'maintaining' the condition causing the pollution within the meaning of § 22a-432."

The trial court, in addressing this issue, as did the defendant in the administrative hearing, looked to the dictionary definitions of the word "maintaining" in an attempt to determine its meaning. The court, unlike the defendant, deemed that the dictionary definitions of "maintaining" all "include the concept of some positive conduct or effort designed to preserve a particular condition." The court concluded, therefore, that the plaintiff's mere passive ownership of land could not be considered as " 'maintaining any . . . condition which . . . created a source of pollution' on that property . . . in accordance with the commonly approved usage of the term 'maintaining.' "

The trial court went on to state that the statutory scheme of the Connecticut Water Pollution Control Act (act); General Statutes § 22a-416 et seq.; provides for the liability of an innocent landowner only if the person actually responsible for the pollution does not comply with an enforcement order, cannot be found, or is unknown. It found, for example, that the defendant is authorized, pursuant to General Statutes (Rev. to 1991) § 22a-451,[11] to contract to have

---

[10] The defendant, on appeal to this court, does not contest the trial court's ruling that the plaintiff was not liable under General Statutes § 22a-433.

[11] "[General Statutes (Rev. to 1991)] Sec. 22a-451. (Formerly Sec. 25-54ee). LIABILITY FOR POLLUTION, CONTAMINATION OR EMERGENCY. EMERGENCY SPILL RESPONSE FUND. (a) Any person, firm or corporation which directly or indirectly causes pollution and contamination of any land or waters of the state or causes an emergency through the discharge, spillage, uncontrolled loss, seepage or filtration of oil or petroleum or chemical liquids or solid, liquid or gaseous products or hazardous wastes or which owns any

pollution of any land or water caused by spill, seepage or discharge removed and to seek reimbursement from those responsible and, only if unsuccessful in securing

hazardous wastes deemed by the commissioner to be a potential threat to human health or the environment and removed by the commissioner shall be liable for all costs and expenses incurred in containing, removing or mitigating such pollution and contamination, emergency or hazardous waste, provided, if such pollution or contamination or emergency was negligently caused, such person, firm or corporation may, at the discretion of the court, be liable for damages equal to one and one-half times the cost and expenses incurred and provided further if such pollution or contamination or emergency was wilfully caused, such person, firm or corporation may, at the discretion of the court, be liable for damages equal to two times the cost and expenses incurred. Upon request of the commissioner, the attorney general shall bring a civil action to recover all such costs and expenses.

"(b) If the person, firm or corporation which causes any discharge, spillage, uncontrolled loss, seepage or filtration does not act immediately to contain and remove or mitigate the effects of such discharge, spillage, loss, seepage or filtration to the satisfaction of the commissioner, or if such person, firm or corporation is unknown, and such discharge, spillage, loss, seepage or filtration is not being contained, removed or mitigated by the federal government, a state agency, a municipality or a regional or interstate authority, the commissioner may contract with any person issued a permit pursuant to section 22a-454 to contain and remove or mitigate the effects of such discharge, spillage, loss, seepage or filtration. The commissioner may contract with any person issued a permit pursuant to said section 22a-454 to remove any hazardous waste that he deems to be a potential threat to human health or the environment.

"(c) Whenever the commissioner incurs contractual obligations pursuant to subsection (b) of this section and the responsible person, firm or corporation or the federal government does not assume such contractual obligations, the commissioner shall request the attorney general to bring a civil action pursuant to subsection (a) of this section to recover the costs and expenses of such contractual obligations. If the responsible person, firm or corporation is unknown, the commissioner shall request the federal government to assume such contractual obligations to the extent provided for by the federal Water Pollution Control Act.

"(d) There is established a revolving fund to be known as the emergency spill response fund, for the purpose of providing money for (1) the containment and removal or mitigation of the discharge, spillage, uncontrolled loss, seepage or filtration of oil or petroleum or chemical liquids or solid, liquid or gaseous products or hazardous wastes including the state share of payments of the costs of remedial action pursuant to the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 USC 9601, et seq.), as amended; (2) provision of potable drinking water

payment, to place a lien for the cost of the cleanup upon the real estate on which the contamination originated.

pursuant to section 22a-471; (3) completion of the inventory required by section 22a-8a; (4) the removal of hazardous wastes that the commissioner deems to be a potential threat to human health or the environment; (5) the accomplishment of the purposes of sections 22a-134aa to 22a-134hh, inclusive, except that the amount expended for the purpose of this subdivision shall not exceed two hundred eighty thousand dollars per year; (6) (A) the provision of short-term potable drinking water pursuant to subdivision (1) of subsection (a) of section 22-471 and the preparation of an engineering report pursuant to subdivision (2) of subsection (a) of said section when pollution of the groundwaters by pesticides has occurred or can reasonably be expected to occur; (B) the study required by Special Act 86-44 and (C) as funds allow, education of the public on the proper use and disposal of pesticides and the prevention of pesticide contamination in drinking water supplies; (7) loans and lines of credit made in accordance with the provisions of section 32-23z; (8) the accomplishment of the purposes of sections 22a-133b to 22a-133g, inclusive, and sections 22a-134 to 22a-134d, inclusive, including staffing, and section 22a-133k; (9) development and implementation by the commissioner of a state-wide aquifer protection program pursuant to the provisions of sections 19a-37, 22-6c, 22a-354c, 22a-354e, 22a-354g to 22a-354bb, inclusive, 25-32d, 25-33h, 25-33n and subsection (a) of 25-84, including, but not limited to, development of state regulations for land uses in aquifer protection areas, technical assistance and educational programs, (10) research on toxic substance contamination, including research by the Environmental Research Institute and the Institute of Water Resources at The University of Connecticut and by the Connecticut Agricultural Experiment Station; (11) the costs of the commissioner in performing or approving level A mapping of aquifer protection areas pursuant to this title; and (12) inventory and evaluation of the farm resource management requirements of farms in aquifer areas by the eight county soil and water conservation districts. The amount expended under subdivisions (6) to (12), inclusive, of this subsection shall be as follows: Under subdivision (6), not more than the amount credited to the emergency spill response fund from the fees collected pursuant to sections 22a-66b to 22a-66j, inclusive, and section 22a-54a, fifty per cent of the amount credited therein from the fees collected pursuant to subsection (g) of section 22a-50, and one-third of the amount credited therein from the fees collected pursuant to (i) subsection (f) of section 22a-54 and (ii) subsection (c) of section 22a-56; under subdivision (7), not more than three million dollars; under subdivision (8), not more than one million dollars per year; under subdivision (9), not more than two hundred fifty thousand dollars per year; under subdivision (10), not more than eighty thousand dollars per year; under subdivision (11), not more than three hundred thousand dollars and under subdivision (12), not more than one hundred twenty thousand dollars for the

See General Statutes (Rev. to 1991) § 22a-452a.[12] The court also noted that if an order to abate pollution is issued to a polluter pursuant to § 22a-432 and the defendant then

fiscal year ending June 30, 1991. Any money recovered pursuant to subsections (a) and (c) of this section shall be deposited in the general fund and credited to the fund established under this section and shall be used to meet any contractual obligations incurred by the commissioner pursuant to subsection (b) of this section for such containment and removal or mitigation."

[12] "[General Statutes (Rev. to 1991)] Sec. 22a-452a. STATE LIEN AGAINST REAL ESTATE AS SECURITY FOR AMOUNTS PAID TO CLEAN UP HAZARDOUS WASTE. (a) On and after June 3, 1985, any amount paid by the commissioner of environmental protection pursuant to subsection (b) of section 22a-451 to contain and remove or mitigate the effects of a spill shall be a lien against the real estate on which the spill occurred or from which it emanated in accordance with the provisions of this section, except that such lien against real estate which has been transferred in accordance with the provisions of sections 22a-134 to 22a-134d, inclusive, shall not have priority over any previous transfer or encumbrance.

"(b) A lien pursuant to this section shall not be effective unless (1) a certificate of lien is filed in the land records of each town in which the real estate is located, describing the real estate, the amount of the lien, the name of the owner as grantor and (2) the commissioner mails a copy of the certificate to such persons and to all other persons of record holding an interest in such real estate over which the commissioner's lien is entitled to priority. Upon presentation of a certificate of lien, the town clerk shall endorse thereon his identification and the date and time of receipt and forthwith record it in accordance with section 42a-9-409.

"(c) Except as provided in subsection (a), such lien shall take precedence over all transfers and encumbrances recorded on or after June 3, 1985, in any manner affecting such interest in such real estate or any part of it on which the spill occurred or from which the spill emanated, or real estate which has been included, within the preceding three years, in the property description of such real estate and is contiguous to such real estate. This subsection shall not apply to real estate which consists exclusively of residential real estate, including but not limited to, residential units in any common interest community, as defined in section 47-202.

"(d) In the case of all other real estate, including real estate which consists exclusively of residential real estate, including but not limited to, residential units in any common interest community, as defined in section 47-202, the lien shall take precedence over any transfer or encumbrance recorded after the commissioner files with the town clerk notice of intent to file a lien on the land records in the town in which the real estate is located.

"(e) When any amount with respect to which a lien has been recorded under the provisions of this section has been paid or reduced, the commis-

finds that the person to whom such order was issued is not the owner of the contaminated land, the defendant may then issue a like order to the owner of the land pursuant to § 22a-433, and the owner only then may be held jointly and severally liable with the person causing the pollution.

The trial court therefore determined that the defendant had improperly held the plaintiff responsible for the cleanup of her property without first attempting to proceed against the actual polluters. Only if that attempt proved fruitless, the court concluded, could the defendant then proceed against the plaintiff. The court concluded that proceeding against an innocent landowner in securing reimbursement for the cleanup of pollution was a last step, not a first. The court remarked that there was good reason to require that an action against an innocent property owner be a last resort because of the possible draconian result of requiring an innocent owner to pay more for the remedial measures than the value of the land on which the pollution exists.

We disagree, and conclude that the trial court: (1) failed to give due deference to the agency's interpretation of § 22a-432 as it applied to the issue raised in this appeal; (2) slighted the legislative history of

sioner, upon request of any interested party, shall issue a certificate discharging or partially discharging such lien, which certificate shall be recorded in the same office in which the lien was recorded. The town clerk shall note the recording of the certificate of discharge upon the original notice of lien. Any action for reduction or discharge of such lien or any appeal therefrom shall be in accordance with the provisions of sections 49-35a to 49-35c, inclusive, except that the forms prescribed in section 49-35a shall be modified as the court deems appropriate. Any action for the foreclosure of such lien shall be brought by the attorney general in the name of the state in the superior court for the judicial district in which the property subject to such lien is situated, or, if such property is located in two or more judicial districts, in the superior court for any one such judicial district, and the court may limit the time for redemption or order the sale of such property or make such other or further decree as it judges equitable."

§ 22a-432; and (3) misconstrued the statute's relationship to the overall scheme of the act. Because we conclude that the defendant correctly decided that the plaintiff's ownership of the land in question could, pursuant to § 22a-432, render her liable in the first instance to abate potential sources of pollution on her land, we reverse the judgment of the trial court and direct it to dismiss the plaintiff's appeal from the defendant's final decision.

I

Preliminarily, we note that the usual scope of a court's review of administrative action is quite limited. *Burnham* v. *Administrator,* 184 Conn. 317, 322, 439 A.2d 1008 (1981); *Riley* v. *State Employees' Retirement Commission,* 178 Conn. 438, 441, 423 A.2d 87 (1979); *Lawrence* v. *Kozlowski,* 171 Conn. 705, 707–708, 372 A.2d 110 (1976), cert. denied, 431 U.S. 969, 97 S. Ct. 2930, 53 L. Ed. 2d 1066 (1977); see also *New Haven* v. *Freedom of Information Commission,* 205 Conn. 767, 773, 535 A.2d 1297 (1988); *Buckley* v. *Muzio,* 200 Conn. 1, 3, 509 A.2d 489 (1986); *Persico* v. *Maher,* 191 Conn. 384, 409, 465 A.2d 308 (1983). The reviewing court may reverse or modify an administrative decision only if the "substantial rights of the . . . [appellant] have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." General Statutes § 4-183 (j).

The trial court, in reviewing the defendant's final decision wherein the defendant had determined that

§ 22a-432 applied to a passive landowner; stated that "the [defendant's] interpretation of the statute is a question of law" and was not entitled to any deference. Although the construction and interpretation of a statute is a question of law for the courts to decide; *Lieberman* v. *State Board of Labor Relations,* 216 Conn. 253, 263, 579 A.2d 505 (1990); *Connecticut Hospital Assn.* v. *Commission on Hospitals & Health Care,* 200 Conn. 133, 140, 509 A.2d 1050 (1986); *Wilson* v. *Freedom of Information Commission,* 181 Conn. 324, 342–43, 435 A.2d 353 (1980); "it is the well established practice of this court to 'accord great deference to the construction given [a] statute by the agency charged with its enforcement.' *Corey* v. *Avco-Lycoming Division,* 163 Conn. 309, 326, 307 A.2d 155 (1972) (*Loiselle, J.,* concurring), cert. denied, 409 U.S. 1116, 93 S. Ct. 903, 34 L. Ed. 2d 699 (1973)." *Griffin Hospital* v. *Commission on Hospitals & Health Care,* 200 Conn. 489, 496, 512 A.2d 199, appeal dismissed, 479 U.S. 1023, 107 S. Ct. 781, 93 L. Ed. 2d 819 (1986); see also *Crocetto* v. *Lynn Development Corporation,* 223 Conn. 376, 381, 612 A.2d 1212 (1992); *Texaco Refining & Marketing Co.* v. *Commissioner of Revenue Services,* 202 Conn. 583, 599, 522 A.2d 771 (1987); *Schlumberger Technology Corporation* v. *Dubno,* 202 Conn. 412, 423, 521 A.2d 569 (1987); *Board of Education* v. *Board of Labor Relations,* 201 Conn. 685, 698–99, 519 A.2d 41 (1986); *Wilson* v. *Freedom of Information Commission,* supra.[13]

The trial court, however, attached no significance to the role of the defendant as commissioner of environmental protection, whose agency is charged with the

---

[13] The plaintiff conceded at oral argument that there was no dispute concerning whether the state had the power, constitutionally, to order the plaintiff to abate the condition on her property. Rather, the plaintiff asserted that this appeal turned solely on the interpretation of General Statutes § 22a-432 and more particularly on the meaning of "maintaining."

enforcement of § 22a-432.[14] Nor did the court give any weight to the fact that the defendant had, on a previous occasion, interpreted § 22a-432 to hold an innocent landowner liable to abate a polluted condition on his land. The trial court instead disregarded the defendant's interpretation of the statute and, contrary to the defendant's decision, determined that the term "maintaining," as used in § 22a-432, required the taking of

---

[14] "[General Statutes] Sec. 22a-424 (Formerly Sec. 25-54c). POWERS AND DUTIES OF COMMISSIONER. The commissioner shall have the following powers and duties:

"(a) To exercise general supervision of the administration and enforcement of this chapter;

"(b) To develop comprehensive programs for the prevention, control and abatement of new or existing pollution of the waters of the state;

"(c) To advise, consult and cooperate with other agencies of the state, the federal government, other states and interstate agencies and with affected groups, political subdivisions and industries in furtherance of the purposes of this chapter. Such powers and duties shall include receiving information provided by the United States Environmental Protection Agency, which if subject to a claim of confidentiality pursuant to the Federal Freedom of Information Act of 1976 (5 USC 552) and regulations adopted thereunder, shall be kept confidential by the commissioner notwithstanding any of the provisions of section 1-19 to the contrary;

"(d) To submit plans for the prevention and control of water pollution and to render reports and accounts to the Administrator of the Environmental Protection Agency and to any other federal officer or agency on such forms containing such information as the said Administrator or any other federal officer or agency, may reasonably require, in order to qualify the state and its municipalities for grants from the United States government;

"(e) To encourage, participate in or conduct studies, investigations, research and demonstrations, and collect and disseminate information, relating to water pollution and the causes, prevention, control and abatement thereof;

"(f) To issue, modify or revoke orders prohibiting or abating pollution of the waters of the state, or requiring the construction, modification, extension or alteration of pollution abatement facilities or monitoring systems, or any parts thereof, or adopting such other remedial measures as are necessary to prevent, control or abate pollution;

"(g) To hold such hearings as may be required under the provisions of this chapter and the federal Water Pollution Control Act or other applicable federal law, for which he shall have the power to issue notices by certi-

some affirmative action in creating pollution on the part of the landowner in order for the defendant to be able to hold the landowner liable for abating that pollution. The trial court relied upon the following dictionary definitions of the word "maintain" to arrive at its conclusion: Webster's Second New International Dictionary ("to hold or keep in any particular state or condition"); Webster's Ninth New Collegiate Dictionary ("1. to keep in an existing state [as of repair, efficiency, or valid-

fied mail, administer oaths, take testimony and subpoena witnesses and evidence;

"(h) To require the submission of plans, specifications and other necessary data for, and inspect the construction of, pollution abatement facilities and monitoring or disposal systems in connection with the issuance of such permits or approvals as may be required by this chapter and the federal Water Pollution Control Act;

"(i) To issue, continue in effect, revoke, modify or deny permits, under such conditions as he may prescribe, for the discharge of any water, substance or material into the waters of the state, or orders for or approval of the installation, modification or operation of pollution abatement facilities or monitoring systems. In taking any action pursuant to this subsection or subsection (f), (h) or (j), the commissioner may reasonably consider any prior violation by an applicant, permittee or recipient of an order, of any statute or regulation administered by the commissioner, or any order or permit issued by the commissioner;

"(j) To require proper maintenance and operation of monitoring and disposal systems;

"(k) To exercise all incidental powers necessary to carry out the purposes of this chapter and the federal Water Pollution Control Act;

"(l) To adopt regulations in accordance with the provisions of chapter 54 to implement this chapter and to comply with the federal Water Pollution Control Act and the federal Safe Drinking Water Act;

"(m) Either on his own initiative or upon complaint, to investigate or order the person who caused or reasonably may be expected to cause the pollution to investigate all points of existing or potential waste discharge which may directly or indirectly result in pollution of the waters of the state provided upon written complaint by the commissioner of health services, the chief executive officer of a municipality, the warden or any of the burgesses of a borough, a committeeman of a fire district or a local or district director of health, the commissioner shall investigate or order the person who caused or reasonably may be expected to cause the pollution to investigate all points of existing or potential waste discharges which may directly or indirectly result in pollution of the waters of the state."

ity]: preserve from failure or decline . . . 3. to continue or persevere in"); Black's Law Dictionary (5th Ed. 1979) ("acts of repairs and other acts to prevent a decline, lapse or cessation from existing state or condition . . . carry on . . . furnish means for subsistence or existence of . . . hold or keep in an existing state or condition"). The court, as previously noted, concluded that such definitions of the word "maintain" imply affirmative action, and therefore that the plaintiff's passive ownership of her property could not be considered "maintaining" a condition under the statute, and that consequently, the plaintiff's situation fell outside the purview of § 22a-432.

The dictionary definitions of the word "maintain," however, are themselves ambiguous, do little to rein in its inherently broad meaning, and can hardly be interpreted invariably to require the taking of affirmative action. See *State Farm Mutual Automobile Ins. Co.* v. *Pan American Ins. Co.,* 437 S.W.2d 542, 545 (Tex. 1969) ("maintenance doubtless includes the idea of keeping in repair, but has a much broader meaning involving the concept of supporting"). Unless we consider who is maintaining what and for what purpose, the word "maintain" has no fixed, abiding, or useful meaning. As this court has remarked "[t]he word 'maintain' has no precise legal significance in the construction of statutes, its meaning varying with the statute in which it is used, the subject-matter of the law, and the purpose to be accomplished by it." *Davis Holding Corporation* v. *Wilcox,* 112 Conn. 543, 547–48, 153 A. 169 (1930); see also *Hasman* v. *Elk Grove Union High School,* 76 Cal. App. 629, 245 P. 464 (1926) (" '[maintain's] meaning . . . depends upon the context in which it appears and the subject matter to which it relates' "); but see *Aaron* v. *Conservation Commission,* 183 Conn. 532, 549, 441 A.2d 30 (1981) (applying Webster's Third New International Dictionary definition of "maintenance" as that word is used in General Statutes § 22a-40).

Because we regard the meaning of the word "maintaining" in § 22a-432 to be ambiguous, an ambiguity not cured by its dictionary definitions, we believe that the trial court, faced with two equally plausible interpretations of the statutory language, failed to give due deference to the defendant's interpretation. Moreover, the ambiguity of the word "maintaining" in § 22a-432 counsels us to make inquiry into sources other than the language of the statute or dictionary definitions. In order to discern the legislature's intent in enacting § 22a-432, we are compelled to look "to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." *Texaco Refining & Marketing Co.* v. *Commissioner of Revenue Services,* supra, 589; see also *Lauer* v. *Zoning Commission,* 220 Conn. 455, 460, 600 A.2d 310 (1991).

II

The Connecticut Water Pollution Control Act (act), set forth in General Statutes §§ 22a-416 through 22a-484, was regarded, at the time of its enactment in 1967, as "a declaration of war against water pollution." 12 S. Proc., Pt. 2, 1967 Sess., p. 667, remarks of Senator William B. Stanley, chairman of Water Resources Committee. Initiated by then Governor John Dempsey, the act was intended to "usher . . . in a new era in the treatment of our water resources. It embodies the concept that no one, whether individual, industry or community, has the right or privilege to render our water resources unusable by pollution." Connecticut's Clean Water Act of 1967: An Analysis of Public Act 57, p. 2.[15]

---

[15] Governor John Dempsey shortly after the enactment of the act stated: "I have been keenly aware of the need for constructive action to deal with this problem before the danger to public health and the threat to wild life

The act comprehensively addressed issues of municipal and industrial water pollution by setting water quality standards, mandating a permit program, establishing a new enforcement scheme and creating tax incentives and low interest loans for constructing pollution abatement facilities.[16] The act was not, however, the legislature's first attempt to control the pollution

reached critical proportions. This situation, growing more acute over the years as our communities have grown larger and as our businesses and industries have expanded, now has reached the stage where the disposal of natural and industrial wastes threatens our total open water supply." Connecticut's Clean Water Act of 1967: An Analysis of Public Act 57, p. 1.

[16] The act was first entitled "AN ACT CONCERNING THE ELIMINATION OF POLLUTION OF THE WATERS OF THE STATE," Public Acts 1967, No. 57.

During the legislative debates over the bill, Representative Peter A. Crombie, selected to explain the bill, provided the following background: "Mr. Speaker, speaking now on Substitute House Bill 2417. Known as the Water Pollution Bill. We are now to consider a measure that should make us proud to be members of the House. Our vote today will benefit not only all citizens of our beloved State but their children and their children's children. We are today about to assure that one of Connecticut's priceless resources—the water of our State—will be restored to cleanliness and thereafter remain so for generations to come. The problem of pollution is both extensive and growing. It is estimated that although more than 90 percent of the effluent from municipalities and industrial operations receive treatment of some kind, only about one-half of the municipal sewage and a quarter of the industrial effluent is adequately treated. The inadequately treated municipal waste discharged into Connecticut waterways is the equivalent of 100,000,000 gallons per day of raw sewage. The industrial wastes discharged into our rivers and streams is the equivalent of another 100,000,000 gallons per day of untreated industrial effluent. It is not even a good pun to say that we are becoming a 'effluent society .' . . .

"The bill before us today faithfully embodies the recommendations of the Clean Water Task Force. . . . Fundamentally, the bill provides:

"1. State grants to municipalities to correct municipal pollution problems. Together with the grants available under the Federal Water Pollution Control Administration, our towns will receive up to 85 percent of the cost of construction of pollution abatement facilities.

"2. Tax benefits of a real and substantial nature to industry to encourage them to build the necessary corrective facilities; and

"3. Enforcement of the laws prohibiting pollution of our state waters. . . ." 12 H.R. Proc., Pt. 3, 1967 Sess., pp. 911–15, remarks of Representative Peter A. Crombie.

of Connecticut's waters.[17] Indeed, the act arose from the ashes of several previous failures to arm the agency charged with enforcing Connecticut's statutes designed to combat water pollution with adequate powers and procedures to solve the state's pollution problems. In 1925, the legislature had established the state water commission which, in 1957, was replaced by the water resources commission; both commissions were given the power by the legislature to plan and coordinate "all activities concerning the abatement of pollution." Public Acts 1957, No. 364, § 2. During the periods of operation of both commissions, however, it was recognized that they were hampered by an inadequate statutory scheme especially as it pertained to the commission's authority to order the abatement of existing sources of pollution. See 12 H.R. Proc., Pt. 3, 1967 Sess., pp. 923–28, remarks of Representative James J. Kennelly; 12 S. Proc., Pt. 2, 1967 Sess., pp. 695–98, remarks of Senator Frederick Pope, Jr.

Consequently, in 1965, Governor Dempsey created the clean water task force, "to examine the pollution problem that we know exists and tell us the best, quickest, and most efficient and economical way to eliminate it." The task force's recommendations were published in a 1966 pamphlet entitled "Clean Water for Connecticut: An Action Program." Although the work of the task force focused on a variety of water pollution control problems, the subcommittee of the

---

[17] The first recorded pollution control action taken by the General Assembly occurred in 1886, when it passed a special act to prohibit Meriden from discharging raw sewage into the Quinnipiac River. See M. Hupfer, Forty Years of Water Pollution Control in Connecticut (1965) p. 3. In 1925, the now defunct state water commission was established by "An Act Concerning the Pollution of Water and Creating a State Water Commission." Public Acts 1925, c. 143, §§ 1 through 9. Under the 1925 act, the commission was authorized to take action against existing and potential sources of pollution. In 1957, the state water commission was replaced by the water resources commission. Public Acts 1957, No. 364.

task force devoted to "Water Law and Legislation" specifically addressed the issue of the enforcement of then existing pollution control laws by the commission, and noted that under the extant statutory framework, the water resources commission was unable to attack existing sources of pollution efficiently. According to the subcommittee, the statutes then governing the commission's activity were ineffective because the commission could not order the abatement of water pollution unless it had considered the rights and interests of all persons involved and had determined that the cost of abatement was not unreasonable or inequitable. See General Statutes (1955 Sup.) § 2114d.[18] As a member of the subcommittee remarked, the commission could stop existing sources of pollution "only after elaborate advice to the polluter as to a treatment system that is both reasonably available and equitable as to cost." The subcommittee therefore recommended that "a new legal approach to water pollution seems necessary. . . . What seems needed is the expansion of existing legislation into a water rights code tailored to the needs of this State. The essential elements of such a code are threefold—first, declaration of the public ownership of all water; second, a statement of the conditions pertaining to the private use thereof; and finally, a statement of policy that pollution is illegal." Clean Water for Connecticut: An Action Program (1966) p. 128. The work of the task force was ultimately embodied in the act. 12 H.R. Proc., Pt. 3, 1967 Sess., p. 914, remarks of Representative Peter A. Crombie.

[18] General Statutes (1955 Sup.) § 2114d, entitled "Order concerning elimination of pollution," provided in relevant part: "If, upon hearing, the commission shall find that any person, firm or corporation is polluting the waters of the state, it may make an order directing such person, firm or corporation to use or to operate some practicable and reasonably available system or means which will reduce, control or eliminate such pollution having regard for the rights and interests of all persons concerned, provided the cost of installation, maintenance and operation thereof shall not be unreasonable or inequitable."

Both the House of Representatives and the Senate, while broadly debating a myriad of issues raised by the proposed act, viewed the pollution problem as a "crisis" situation demanding expedient measures and prompt action. The legislature shared the task force's impression that the water resources commission needed to be armed with more effective procedures for enforcing its orders to abate pollution. Representative James J. Kennelly, designated to explain the act's enforcement provisions, noted: "Mr. Speaker, this bill seeks to eliminate pollution in the waters of our state by a two-pronged attack. The distinguished gentlemen from the 118th and 167th who have preceded me have addressed themselves to the first of these two prongs in the context of grants to municipalities and tax benefits to industry and in both of these areas seek to encourage the construction of pollution abatement facilities. The second prong in the thrust of our attack upon the extant pollution situation, is a *declaration of illegality* of water pollution and specific procedures for enforcement of the law." (Emphasis added.) 12 H.R. Proc., Pt. 3, 1967 Sess., pp. 923–24, remarks of Representative James J. Kennelly. Representative Kennelly further noted that, under the proposed legislation, the water resources commission could operate more vigorously in issuing orders of abatement and ultimately seeking injunctions to abate water pollution, regardless of concerns of economic feasibility. The enforcement provisions in the act signified a move away from the standard the commission once used to assess a given case. Id., p. 926. The standard under which the commission had operated was "a standard of economic feasibility" which had allowed "for broad exceptions and exemptions from the meaningful effect of orders of the waters resources commission." Id. The new, proposed standard for the act, was "one of technological reasonableness." Id. Regardless of the cost of the

pollution abatement measures issued by the commission, the measures were to be enforced if in fact the technology existed to enforce them.[19]

The legislative sentiment regarding the importance of the act crystallized in the act's declaration of policy, currently set forth in General Statutes § 22a-422, which provides that: "It is found and declared that the pollution of the waters of the state is inimical to the public health, safety and welfare of the inhabitants of the state, *is a public nuisance* and is harmful to wildlife, fish and aquatic life and impairs domestic, agricultural, industrial, recreational and other legitimate beneficial uses of water, and that the use of public funds and the granting of tax exemptions for the purpose of controlling and eliminating such pollution is a public use and purpose for which public moneys may be expended and tax exemptions granted, and the necessity and public interest for the enactment of this chapter and the elimination of pollution is hereby declared as a matter of legislative determination." (Emphasis added.)

The available legislative sources concerning the enactment of the act in 1967 indicate that, although

---

[19] The Senate echoed the concerns of the House of Representatives that the current operation of the water resources commission had not been effective in cleaning up the state's water pollution. While discussing the history of this pollution, and after remarking that the commission had been unable to issue many abatement orders, Senator Frederick Pope, Jr., noted that, "[a]bout ten years ago, the people of the State, and this is true throughout the country, [became] concerned over what we generally call conservation. One of the aspects of conservation, and perhaps, the most immediate one is the matter of water pollution. We've had in the last ten years, a growing body of public opinion in support of more stringent laws in this regard. So that is how we got the Clean Water Task Force, and that is how we got this bill." 12 S. Proc., Pt. 2, 1967 Sess., pp. 696–98. Senator Pope then stated that he hoped that the commission would act more vigorously than it had in issuing and enforcing its abatement orders. Finally, Senator Pope remarked that he regarded as one of the great additions to the water legislation contained in the act the fact that pollution was defined "as a public nuisance in any form." Id., p. 697.

the legislature had not specifically addressed the issue of whether the word "maintaining," as used in § 22a-432, included passive ownership of property, the legislature did mandate that the defendant[20] be given broad powers under the act to issue orders necessary to correct existing and potential sources of pollution and to achieve the remedial purposes of the act. Environmental statutes, considered remedial in nature, are to be construed liberally to reach the desired result. *Manchester Environmental Coalition* v. *Stockton,* 184 Conn. 51, 57, 441 A.2d 68 (1981). In light of the remedial purposes of the act, we conclude that the legislature intended that the word "maintaining" in § 22a-432, be interpreted liberally to include within its purview a landowner who has failed to abate pollution existing on his or her land that reasonably could be expected to create a source of pollution to the state's waters regardless of blame for the creation of the condition. We conclude that, pursuant to § 22a-432, the defendant was empowered to order a cleanup of polluted land without regard to fault or economic hardship.

This conclusion is bolstered by the fact that § 22a-432 appears to have been intended to track and incorporate the common law of public nuisance. By declaring that "the pollution of the waters of the state is inimical to the public health, safety and welfare of the inhabitants of the state, [and] a *public nuisance*" (emphasis added) in General Statutes § 22a-422, the legislature appears to have assimilated, where appropriate, the common law of nuisance into the act. The common law, and particularly the law of public nuisance at the time of the passage of § 22a-422, figured prominently in water pollution control and had set the stage for legislation concerning abatement of water pollution. See Water

---

[20] In 1971, to implement the act, the water resources commission was replaced by the department of environmental protection. Public Acts 1971, No. 872.

Resources of Connecticut, Report to the General Assembly by the Water Resources Commission (1957) p. A-29 ("[j]udicial decisions constitute the source of most of Connecticut law relating to rights to use water").[21] Indeed, it hardly seems accidental that the legislature, in § 22a-432, used the words "maintaining . . . [a] condition," which condition, it had declared in § 22a-422, to be a "public nuisance." "Maintaining a nuisance" is a legal term of art, having a technical meaning in the common law of nuisance. The case law of public nuisance is replete with the use of this phrase and its equivalents, i.e., "maintaining" or the "maintenance of" a condition regarded as a nuisance; the phrase also appears in the Practice Book forms of model complaints in nuisance actions.[22]

---

[21] The common law concerning water pollution had been considered the primary means for controlling water pollution. In fact, in 1957, the water resources commission had filed a report to the legislature in which it noted that the common law, because of its inherent flexibility, was far more capable of controlling water pollution than statutory rules that often were not subject to change. See Water Resources of Connecticut, Report to the General Assembly by the Water Resources Commission (1957) pp. A-1 through A-70.

[22] See, e.g., *Kostyal* v. *Cass,* 163 Conn. 92, 93, 302 A.2d 121 (1972) (the plaintiff alleged that the named defendant was liable for the leakage of oil into a well, a nuisance created and maintained by the defendants); *Marchitto* v. *West Haven,* 150 Conn. 432, 437, 190 A.2d 597 (1963) ("[i]t is well established that a town may be held liable for injury resulting from a nuisance created and maintained by it"); *Leach* v. *Florkosky,* 145 Conn. 490, 491, 144 A.2d 334 (1958) ("action for an injunction to restrain the defendants from operating a motor vehicle junk business . . . on premises owned by the defendants . . . and from maintaining a nuisance thereon"); *Bergner* v. *State,* 144 Conn. 282, 283, 130 A.2d 293 (1957) (complaint charged "the defendant . . . with negligence and with creating and maintaining a nuisance"); *Corvo* v. *Waterbury,* 141 Conn. 719, 721, 109 A.2d 869 (1954) ("action to recover damages for injury to their property, alleged to have been caused by the defendants through their maintenance of a nuisance and their failure to maintain and repair a retaining wall"); *Stratford Theater, Inc.* v. *Stratford,* 140 Conn. 422, 424, 101 A.2d 279 (1953) ("the defendant was guilty of negligence and of maintaining a nuisance and that this negligence and nuisance were the proximate causes of the flooding of the theater"); *Tenney* v. *Pleasant Realty Corporation,* 136 Conn. 325, 329, 70 A.2d 138 (1949) ("[a]n abutting owner, in the absence of statute or ordinance, ordinar-

Under the common law of nuisance at the time of the enactment of § 22a-432, a landowner, once apprised of the existence on his or her land of a contaminated condition, could generally be held liable for "maintaining a nuisance" on that property, without regard to fault and regardless of whether the landowner had created or caused the condition. See *Swift & Co.* v. *Peoples Coal & Oil Co.,* 121 Conn. 579, 186 A. 629 (1936); *Johnson* v. *Lewis,* 13 Conn. 303, 307 (1839). In *Swift & Co.,* for instance, this court held that a company could be liable for "maintaining a nuisance" after contaminated fluid had seeped from the company's property into the basement of an adjoining building. We noted in *Swift & Co.* v. *Peoples Coal & Oil Co.,* supra, 588–89, that "[a] nuisance may grow out of negligence . . . but it may exist where the use a person is making of his property

ily is under no duty to keep the sidewalk in front of his property in a reasonably safe condition for public travel, though he may be liable for maintaining a nuisance thereon"); *Perkins* v. *Weibel,* 132 Conn. 50, 51, 42 A.2d 360 (1945) (the plaintiff, who fell on a sidewalk due to a greasy condition thereon, charged the landowner with "maintenance of a nuisance"); *Croughwell* v. *Chase Brass & Copper Co.,* 128 Conn. 110, 112, 20 A.2d 619 (1941) ("[a]ction to recover damages for personal injuries, alleged to have been caused by negligence of the defendant and by nuisance maintained by it"); *Bagni* v. *Bristol,* 127 Conn. 38, 41, 14 A.2d 716 (1940) ("[w]here a municipal corporation creates and maintains a nuisance"); *Wheaton* v. *Putnam,* 126 Conn. 330, 331, 11 A.2d 358 (1940) (smoke from material burned in public dump by other than the defendant's agents constituted "maintenance" of a nuisance to the occupants of the neighboring property); *Platt Bros. & Co.* v. *Waterbury,* 72 Conn. 531, 547–48, 45 A. 154 (1900) (riparian proprietor cannot acquire by any prescription a right to maintain a nuisance); *Lomangino* v. *LaChance Farms, Inc.,* 17 Conn. App. 436, 439, 553 A.2d 197 (1989) ("[t]he plaintiffs contend that genuine issues of fact exist in this case as to whether [the defendant mortgagee] . . . was a substantial factor in causing or maintaining the alleged nuisance"); *LaPalme* v. *Tottle,* 16 Conn. Sup. 121 (1949) (patron of restaurant alleged that he "was injured by fall upon flight of stairs which were maintained in such condition as to constitute a nuisance").

See also Practice Book (1963) Form 355 ("Injunction and Damages, in Case of Nuisance by Maintenance of Slaughterhouse") and Practice Book (1978) Form 104.4 ("Injunction Against Nuisance—Maintenance of Disposal Area").

is not in any respect negligent but nevertheless results in damage to his neighbor. . . . As the percolating of oil into the plaintiff's premises would constitute a nuisance, it was not necessary for it to prove negligence." (Citations omitted.) See also *Southern New England Ice Co.* v. *West Hartford,* 114 Conn. 496, 507–508, 159 A. 470 (1932) (holding that "where one builds or maintains upon his land a structure which creates a permanent nuisance upon the lands of another to his injury, not because of any negligence in the construction or maintenance of the structure, the latter is entitled to recover once for all damages for the injury").

In defining the scope of § 22a-432 to apply to "any person . . . [who] is maintaining . . . [a] condition," it appears that the legislature envisioned that the word "maintaining" would, consistent with the common law of nuisance, encompass situations where, without fault, a contaminated condition existed on an owner's land. The facts of this case amply demonstrate that the plaintiff currently owns property on which there exists a nuisance in the form of pollution of which she has been made aware. Because the plaintiff, under the common law of nuisance at the time § 22a-432 was enacted, could, regardless of fault, have been subjected to liability for maintaining a nuisance on her land, we conclude that § 22a-432 was properly applied by the defendant.

Our conclusion concerning the scope of the term "maintaining" is also supported by the statutory changes made to § 22a-432 subsequent to its enactment in 1967. Public Acts 1967, No. 57, § 11. In 1967, that section permitted the defendant to issue an order to "any person . . . maintaining any facility or condition which can reasonably be expected to create a source of pollution to the waters of the state." In 1984, the legislature by Public Acts 1984, No. 84-239, § 1,

amended § 22a-432 to extend liability to any person who "has *established* . . . or *created*" (emphasis added) a condition that "reasonably can be expected to create a source of pollution to the waters of the state." By this subsequent amendment, the legislature was obviously attempting to make a distinction between the active creation of pollution characterized by the words "established or created" and the passive maintenance of a condition characterized by the term "maintaining" that had incorporated the common law of nuisance. Thus, by the amendment, § 22a-432 was expanded to reach not only landowners who were passively maintaining a nuisance but also those persons who had actively created or established a source of pollution.

The plaintiff contends, however, that the defendant's interpretation of § 22a-432 violates a rule of statutory construction that dictates that legislation must be read as a whole and construed to give effect to and harmonize all its parts and avoid duplication. See *State* v. *Ellis,* 197 Conn. 436, 472–73, 497 A.2d 974 (1985); *Bahre* v. *Hogbloom,* 162 Conn. 549, 554, 295 A.2d 547 (1972). The plaintiff argues that if § 22a-432 is construed so that mere ownership of contaminated land is tantamount to "maintaining . . . [a] condition which reasonably can be expected to create a source of pollution to the waters of the state," then § 22a-432 would render § 22a-433 superfluous. Section 22a-433 provides in relevant part: "Whenever the commissioner issues . . . an order to correct potential sources of pollution pursuant to the provisions of section 22a-432 . . . and the commissioner finds that such person is not the owner of the land from which such . . . potential source of pollution emanates, he may issue a like order to the owner of such land." The plaintiff contends that if the landowner were always responsible for pollution under § 22a-432, then the defendant would never have need to rely on § 22a-433 to issue an order to an

owner of contaminated land. The plaintiff therefore asserts that proper effect can be given to both statutes only if § 22a-432 is interpreted so that mere ownership is not sufficient to constitute "maintaining" a condition likely to cause pollution.

We do not, however, read § 22a-432 as necessarily making ownership of contaminated property a sufficient basis for subjecting a landowner to liability for "maintaining . . . [a] condition." Under the common law of nuisance, a landowner who was not in fact in possession of his or her property, but who had leased it to a tenant, was not considered liable for a nuisance "where that nuisance did not exist when they were leased or was not a result reasonably to be anticipated from their use for the purpose and in the manner intended." *Swift & Co.* v. *Peoples Coal & Oil Co.*, supra, 592; see also *Calway* v. *Schaal & Son, Inc.*, 113 Conn. 586, 592, 155 A. 813 (1931). Because we construe § 22a-432 as having been intended to embrace the common law of nuisance, we do not read it to authorize the commissioner to issue an abatement order pursuant to that section to a blameless owner who was not in possession of his property, but who had leased it to a tenant. In such a case, the tenant in possession, rather than the landlord, would be considered the person who had created or was maintaining the condition that had the potential to cause pollution to the waters of the state.

Apparently to reach the owners of such leased properties who would not have been liable under the common law, the legislature enacted § 22a-433. Specifically, if the person or entity to whom an abatement order is issued under § 22a-432 is not the landowner but a tenant in possession, the defendant could, in addition to holding the tenant responsible for abating the condition, hold the owner-lessor jointly and severally liable with the tenant under § 22a-433. So understood, §§ 22a-432 and 22a-433 are complementary rather than

duplicative. The statutes operate in conjunction to enable the commissioner to impose liability not only on those who had "established . . . or created" the pollution or were "maintaining" a condition, but also on the owner of the land. Section 22a-433, therefore, provides a legal avenue, not available at common law, enabling the defendant to impose liability on a landowner even if the owner did not "establish or create" the condition or was not "maintaining" the condition. Together, §§ 22a-432 and 22a-433 enable the commissioner, in order to achieve the act's remedial purposes, to impose liability on all those who, in some way, have responsibility toward the land.

Turning to the facts of the present case, the plaintiff, at the time the defendant issued the enforcement order, was not leasing her property to a tenant who could be regarded as "maintaining" the condition that contaminated her land. In the absence of such a third party, the defendant appropriately issued the plaintiff an enforcement order, pursuant to § 22a-432, because she was the owner of the fee and had dominion over the land on which the pollution exists.

The plaintiff, however, argues that § 22a-432 should not be read to reflect the common law of nuisance because elsewhere in the act the legislature modified the common law. General Statutes § 22a-428, for example, states that the commissioner can hold municipalities liable whenever "a community pollution problem exists." Under the applicable common law, however, a municipality is liable for maintaining a nuisance only if, in fact, the municipality both created and maintained the nuisance by some positive act. See *Brennan* v. *West Haven,* 151 Conn. 689, 692, 202 A.2d 134 (1964). The plaintiff reasons that because § 22a-428 does not require that a municipality have taken an affirmative step to create a nuisance in order to be held liable to

abate a community pollution problem, the legislature similarly could not have intended that the common law be reflected in § 22a-432.

We do not, however, regard the modification of the common law in another section of the act as precluding the incorporation of the common law in § 22a-432, the specific provision at issue. Nor do we believe it necessary that the legislature expressly have stated that it was incorporating the common law, in order to apply common law principles of nuisance to § 22a-432. It is assumed that all legislation is interpreted in light of the common law at the time of its enactment. 2A J. Sutherland, Statutory Construction (4th Ed. Sands 1984 Rev.) § 50.01.[23]

Until the enactment of the act, the common law had been the principal means used to force individuals and municipalities to abate water pollution.[24] We believe, therefore, that the legislature in enacting § 22a-432, sought to incorporate the common law of nuisance to preserve its effectiveness.[25] In enacting such provisions

[23] Even if the legislature did not incorporate the common law of nuisance when it enacted General Statutes § 22a-432, this court is nonetheless permitted, in cases where, as here, the language of a statute is subject to different reasonable interpretations, to refer to the applicable common law principles at the time of the statute's enactment to provide guidance. 2A J. Sutherland, Statutory Construction (4th Ed. Sands 1984 Rev.) § 50.01.

[24] That nuisance law played such a vital role in environmental statutes is noted in Professor William H. Rodger's preface to his treatise, Environmental Law: Air and Water (1986) pp. 1-2: "To a surprising degree, the legal history of the environment has been written by nuisance law. There is no common law doctrine that approaches nuisance in comprehensiveness or detail as a regulator of land use and of technological abuse . . . . *Nuisance theory is the common law backbone* of modern environmental and energy law." (Emphasis added.)

[25] General Statutes § 22a-432 was not the first occasion on which the legislature incorporated the law of nuisance. In 1949, the legislature enacted General Statutes (1949 Rev.) § 4205, now codified at § 19a-340, entitled "Nuisances created by filthy water." Section 19a-340 provides: "Any person who places, collects or allows to remain upon the surface of land owned or occupied by him, or discharges or allows to be discharged from his prem-

as §§ 22a-433 and 22a-428, however, the legislature intentionally went beyond the common law to provide new avenues to combat the problem of pervasive pollution where there was a question as to the effectiveness of the common law. We, therefore, do not agree with the plaintiff's argument that § 22a-432 does not embody the common law of public nuisance.

## III

The plaintiff finally argues that the legislative history of the act suggests that the legislature intended that the public treasury, rather than the landowner, be required to bear the cost of cleaning up contaminated property. The plaintiff supports her argument by noting that the act permits the use of public funds and tax exemptions for the purpose of "controlling and eliminating" water pollution. The plaintiff reasons that because the legislature declared, in § 22a-422, that the control and elimination of water pollution justifies the use of public funds, it would be in keeping with the intent of the act first to use public funds to clean up the pollution on her land and, only after such funds had been expended, to seek reimbursement.

The trial court embraced the same line of reasoning and noted that pursuant to General Statutes

---

ises upon the land of another or upon any public land, any filthy water, garbage or other filthy or noxious matter, whereby the owner or occupant of land in the vicinity thereof is injured or annoyed, or discharges or deposits upon the watershed of any stream or reservoir used to supply water to any community filthy or noxious matter, or any person who, outside of a city or borough, in any town, engages or assists in the business of manufacturing fertilizers or other products from refuse animal matter, at any place within half a mile from a public highway, without license from the director of health of such town, shall be fined not more than fifty dollars. The court before which such conviction is had may order the accused to remove such nuisance within three days, and, upon his failure to do so, it shall be removed by a constable of the town where such nuisance is maintained, and the court may tax the cost of the same against the accused and issue execution therefor."

§ 22a-449 (b), the emergency response statute, the defendant should have cleaned up the plaintiff's property and, after having done so, sought out the responsible parties for reimbursement. To achieve this end, the court reasoned that the defendant, pursuant to § 22a-451, could have contracted to have the pollution cleansed from the plaintiff's land and then sought repayment for the cost of the cleanup from those responsible for the pollution. Thereafter, if unsuccessful, the defendant could have placed a lien against the plaintiff's real estate, pursuant to General Statutes § 22a-452a, for the amount expended. In a nutshell, the trial court concluded that §§ 22a-449, 22a-451 and 22a-452a required that the defendant first abate the pollution and then, if possible, identify and assess those responsible and not impose the cost of the cleanup on the innocent landowner except as a last resort. The effect of the trial court's reasoning is that, faced with two alternatives, the defendant was bound to choose the alternative that was least harmful to the innocent landowner.

We do not, however, read the act as mandating such a choice. Although there exist several provisions in the act that allocate public funds to municipalities and persons through the use of low interest loans and tax exemptions for the purpose of constructing abatement facilities[26] and elaborate procedures to fund emergency clean-up operations,[27] the act does not rule out impos-

[26] See, e.g., General Statutes §§ 22a-439, 22a-440, 22a-443, 22a-449.

[27] Under the state's superfund statute, General Statutes § 22a-449, the commissioner is authorized to remediate pollution in emergency situations with the use of an emergency spill response fund and to seek reimbursement after the cleanup from the responsible party. We note that statutes specifically addressing emergency response to hazardous spills, e.g., General Statutes §§ 22a-449, 22a-451 and 22a-452, were not originally part of the act, as enacted in 1967. Public Acts 1967, No. 57.

At oral argument, the plaintiff noted that the defendant had anticipated using the emergency spill response to remediate the contaminated condition on the plaintiff's property. The plaintiff stressed, however, that this statutory scheme was completely separate and independent from General Statutes § 22a-432, and not relevant to the resolution of this appeal.

ing a large portion of the costs for abating water pollution on individual property owners rather than on the public purse. Indeed, the legislative framework for imposing liability for abating water pollution suggests that the act was intended to combine both public and private funds and efforts in a concerted endeavor to improve water quality. For instance, the effect of § 22a-433, imposing joint and several liability on the landowner and the party ostensibly responsible for pollution, is to make the polluter and the landowner jointly and severally liable for the cleanup of the landowner's property. The legislature in enacting § 22a-433 must have recognized that it was quite possibly imposing the ultimate responsibility for abating pollution on what might very well be a blameless landowner rather than on the polluter or the state.[28] Such a legislative approach, however, saves the taxpayers money and simply places the ultimate responsibility for the elimination of pollution where the elimination of most nuisances was placed by the common law, on the landowner.

In summary, whether the defendant utilizes the act provisions applicable to emergency spills to clean up the plaintiff's contaminated property or issues an abatement order to the owner under § 22a-432, is a matter that is delegated to the defendant's discretion. The legislature has provided the alternatives but has not mandated that the defendant pursue a particular course

[28] Moreover, the legislature believed that scattering liability broadly on individuals connected with the contaminated land would lessen the administrative delay in determining who in fact was culpable for the pollution. As Representative James J. Kennelly remarked, when discussing General Statutes § 22a-433, "[i]n a further consideration that is significant [sic] allows the owner of land to be made a party to a proceeding before the Commission and held jointly and severally liable with the tenant, and in this fashion, to avoid the question of it is not the tenant's responsibility, it is the owner. You can get into a long delay which truly defeats meaningful implementation and enforcement aspect of the bill." 12 H.R. Proc., Pt. 3, 1967 Sess., p. 927.

of action. The plaintiff does not contend that the defendant, in this instance, abused that discretion in issuing an abatement order to the plaintiff pursuant to § 22a-432.

We realize that our resolution of this appeal may result in the imposition of liability on the plaintiff for abating the pollution on her land, the cost of which may be in excess of the value of the land. That appears to be a draconian result that violates notions of fairness.[29] We also recognize that there may be others who, without fault of their own, find themselves the owners of polluted real estate without their having created or caused the contamination.[30] Our perception, however, is that the legislature in 1967, when § 22a-432 was enacted, saw the state's water pollution problem as being so grave that its concern for the public welfare outweighed any sympathy for individual property owners. What legislative history is available suggests that the legislature in fact anticipated, weighed, and ultimately resolved the various concerns engendered by § 22a-432 against the landowner and in favor of the public and clean water.

[29] At the other end of the financial spectrum, however, the result we reach today will also impose liability on a financially secure owner of valuable land for the costs of cleanup that are far less than the value of the land. In that instance, there is nothing unfair about placing the cost on the landowner who derives benefit from the land, rather than on the taxpayers. Thus, whether the result appears "fair" or "unfair" will often turn on the particulars of the case. This highlights the fact that the legislature entrusted such decisions to the administrative discretion of the defendant, rather than, as the plaintiff's position would imply, requiring the defendant to exhaust other remedies before proceeding against the landowner.

[30] We note that General Statutes § 22a-452b provides a limited exemption for a mortgagee who acquires title to real estate by foreclosure. Section 22a-452b provides: "Notwithstanding any provision of the general statutes, a mortgagee who acquires title to real estate by virtue of a foreclosure or tender of a deed in lieu of foreclosure, shall not be liable for any assessment, fine or other costs imposed by the state for any spill upon such real estate beyond the value of such real estate, provided such spill occurred prior to the date of acquisition of title to such real estate by such mortgagee."

The legislature was aware when enacting § 22a-432 that previous legislation governing the now defunct water resources commission had included several equitable considerations that were required to be entertained whenever the commission issued an abatement order. General Statutes (1955 Sup.) § 2114d, for instance, provided that the commission "may make an order directing such person, firm or corporation to use or to operate some practicable and reasonably available system or means which will reduce, control or eliminate such pollution having regard for the rights and interests of all persons concerned, provided the cost of installation, maintenance and operation thereof shall not be unreasonable or inequitable." The absence of any mention of economic feasibility in the act's current enforcement provisions signals a move away from the considerations the water resources commission had once used to determine its course of action in an individual case. The present provisions do not require the defendant to consider the economic impact of a given abatement order, but only its technological feasibility.

The emphasis on clean water over possible individual hardship is manifested in the act's declaration, in § 22a-422, that water pollution is a "public nuisance." See *New York* v. *Shore Realty Corporation,* 759 F.2d 1032 (2d Cir. 1985), in which the Second Circuit Court of Appeals carefully analyzed and applied the common law of public nuisance to impose strict liability on landowners for the cleanup of hazardous waste. Simply, the legislature, in declaring pollution of our waters to be a "public nuisance," established a policy that clean water was a public right. Under the common law, "[n]uisances are public where they violate public rights, and produce a common injury, and where they constitute an obstruction to public rights . . . ." (Internal quotation marks omitted.) *Higgins* v. *Connecticut Light & Power Co.,* 129 Conn. 606, 611, 30 A.2d 388 (1943).

"A public nuisance is one that injures the citizens generally who may be so circumstanced as to come within its influence." *Nolan* v. *New Britain,* 69 Conn. 668, 678, 38 A. 703 (1897). Because a public nuisance implicates the rights of the public and the exercise of the state's police power, the legislature could legitimately determine that the plaintiff's lack of culpability for the existence of the contaminated condition is outweighed by the state's interest in protecting public resources. The application of this principle was manifested in *National Wood Preservers, Inc.* v. *Department of Environmental Resources,* 489 Pa. 221, 414 A.2d 37, appeal dismissed, 449 U.S. 803, 101 S. Ct. 47, 66 L. Ed. 2d 7 (1980), in the context of a challenge to § 316 of the Pennsylvania Clean Streams Law. In that case, the plaintiffs had argued that the statute was unconstitutional because it imposed liability solely on the basis of ownership or occupancy, and regardless of who caused the pollution. In response, the court stated: "It is appropriate that a property holder's responsibility has little significance in determining the validity of the state regulation. . . . The notion of fault is least functional . . . when balancing the interests of a property holder against the interests of a state in the exercise of its police power, because the beneficiary is not an individual but the community." Id., 239–40 n.18.

We conclude that the commissioner properly interpreted the meaning of the term "maintaining" in § 22a-432 to hold the plaintiff liable for abating the pollution on her property, which pollution reasonably can be expected to be a source of pollution to the waters of this state. If the result is unduly harsh, the remedy properly lies with the legislature and not this court.

The judgment is reversed and the case is remanded with direction to dismiss the plaintiff's administrative appeal.

In this opinion PETERS, C. J., BORDEN, NORCOTT, KATZ and SANTANIELLO, Js., concurred.

BERDON, J., dissenting. I disagree with the majority's conclusion that a property owner, without any fault on his or her part, may be required to remove pollutants from his or her property, even though the cost of removal could substantially exceed the value of the property. I agree with the trial court's well reasoned opinion that "maintaining any facility or condition which reasonably can be expected to create a source of pollution" under General Statutes § 22a-432 requires more than passive ownership. Active, or positive conduct—that is, some fault on the part of the property owner—is required for one to *maintain* the condition that pollutes the waters. Without this conduct, a property owner should not be liable for full remediation costs. If this becomes our law, persons will be compelled to obtain costly environmental surveys before they acquire title to any property. Indeed, it would be foolhardy for a person to accept an inheritance, as the plaintiff did here, without such a costly survey.

I cannot believe that the legislature intended such a draconian result. The majority concedes that the result "violates notions of fairness." Neither the plaintiff nor her deceased husband, from whom she inherited the property, were at fault in this case.[1] Yet, the majority interprets the statute to hold her personally liable for the cleanup as well as subjecting her to fines of up to $25,000 per day. See General Statutes § 22a-438.

Furthermore, the majority opinion will raise havoc with our financial institutions, with the state economy and with the ability of persons to purchase homes. Although General Statutes § 22a-452b provides an exemption for mortgagees who acquire title to real estate by foreclosure, the exemption, as the majority

---

[1] Indeed, as the majority points out, the plaintiff did not have access to the property from the time she took title until the pollutants were discovered.

concedes, is a limited one. The exemption merely relieves the mortgagee who obtains title to property by way of foreclosure or tender of a deed in lieu of foreclosure from "assessment, fine or other costs imposed by the state." It does not exempt the mortgagee from an order issued by the defendant, similar to the one issued in this case, to abate and remove the pollution. In addition, such an order can clearly be enforced by issuance of a mandatory injunction.

The amicus brief filed by the Connecticut Bankers Association and The Banks' Association of Connecticut forcefully points out (pp. 2–5) the substantial impact of the decision: "[T]he amici wish to emphasize to this court that a ruling contrary to that issued by the Superior Court will not only have a devastating impact upon [the plaintiff], but will also have a significant adverse impact on an already struggling commercial real estate industry in the State of Connecticut. . . . If the word 'maintain' as used in . . . § 22a-432 does not require 'active involvement,' or 'positive conduct or effort,' the reach of the [Department of Environmental Protection (DEP)]'s enforcement arm will go far beyond innocent landowners such as [the plaintiff]. Rather, the DEP would have the unilateral ability to impose liability upon other innocent parties such as secured lenders and fiduciaries who hold properties in trust. Moreover, taken to its logical extreme, the DEP's interpretation of . . . § 22a-432 would make an innocent lender potentially liable for environmental cleanup costs from the very moment that the closing papers are signed because the DEP, on its own authority, could conclude that a lender 'maintained' a condition giving rise to liability under . . . § 22a-432 by entering into contractual agreements (e.g., a mortgage) with a borrower who owns contaminated land. . . .

"The inevitable result of this decision will be a further reduction in the availability of credit and an

increase in the costs of loan transactions. The shock wave from a reversal of the Superior Court's decision will spread far beyond [the plaintiff] and secured lenders, and will be felt by all persons seeking financial assistance to fund new plant[s] or property—even those persons who have not caused or contributed to the contamination. At a time when Connecticut's economy is suffering through the throes of a recession, the lending industry and manufacturers can ill afford the uncertainty and risks that will result if the Superior Court's decision is overruled." See also amicus curiae brief of the Banking Law Section of the Connecticut Bar Association.

It is important to note that the defendant is not without a remedy for pollution that occurs without fault on the part of the landowner. If the party that caused the pollution does not act immediately to contain and remove or mitigate the condition, or if the party is unknown, the defendant may contract to clean up the site. General Statutes § 22a-451 (b). General Statutes § 22a-452a provides that "any amount paid by the commissioner . . . pursuant to subsection (b) of section 22a-451 to contain and remove or mitigate the effects of a spill shall be a lien against the real estate on which the spill occurred or from which it emanated . . . ." Thus, in this case, under the alternative statutory scheme which allowed the defendant to recover remediation costs by filing a lien on the plaintiff's property, the plaintiff could have been held liable to the extent of the value of her land.

This case is not about being for or against the environment. Certainly, no one wants to pollute or endanger our drinking water. This case boils down to the simple issue of *fairness*. No one is suggesting that the innocent property owner should not ultimately be responsible to the extent of the value of the land. Rather, the issue is whether the *innocent* landowner

should be financially liable for the enormous cost of remediation, which is likely to amount to sums over and above the value of her property, subjected to staggering fines or open to even more severe action by the court. I do not believe that the legislature intended such a harsh result.

In addition, I disagree with the majority's analysis. For § 22a-432 to impose liability in this case, as the majority points out, the court must find that mere ownership of property, without fault, amounts to "maintaining" a condition that "reasonably can be expected to create a source of pollution."

First, the majority sets an erroneous standard by stating that our review is "quite limited." Although our review may be somewhat limited, we are not required to abstain from review or to give carte blanche to the administrative agency's interpretation. On the contrary, we have a legislative mandate to review and reverse decisions that are in "violation of . . . statutory provisions" or "in excess of the statutory authority of the agency . . . ." General Statutes § 4-183 (j).

The majority concludes that we must travel down the path set by the defendant's construction of § 22a-432 by according the defendant's interpretation great deference. We have long held that "[a]lthough the *factual and discretionary* determination of administrative agencies are to be given considerable weight by the courts . . . it is *for the courts,* and not for administrative agencies, to expound and apply governing principles of law." (Citations omitted; emphasis added; internal quotation marks omitted.) *Connecticut Humane Society* v. *Freedom of Information Commission,* 218 Conn. 757, 762, 591 A.2d 395 (1991). Furthermore, we have always withheld this deference when there has been no previous judicial scrutiny. "Ordinarily, the construction and interpretation of a statute is a question

of law for the courts where the administrative decision *is not entitled to special deference,* particularly where, as here, the statute has not previously been subjected to judicial scrutiny or time-tested agency interpretations. *Texaco Refining & Marketing Co.* v. *Commissioner,* 202 Conn. 583, 599, 522 A.2d 771 (1987); *Schlumberger Technology Corporation* v. *Dubno,* 202 Conn. 412, 423, 521 A.2d 569 (1987); see also *Board of Education* v. *Board of Labor Relations,* 201 Conn. 685, 698–99, 519 A.2d 41 (1986); *Wilson* v. *Freedom of Information Commission,* 181 Conn. 324, 342–43, 435 A.2d 353 (1980). *New Haven* v. *Freedom of Information Commission,* 205 Conn. 767, 773–74, 535 A.2d 1297 (1988)." (Emphasis added; internal quotation marks omitted.) *State Medical Society* v. *Board of Examiners in Podiatry,* 208 Conn. 709, 718–19, 546 A.2d 830 (1988); see also *Connecticut Light & Power Co.* v. *Department of Public Utility Control,* 210 Conn. 349, 357, 554 A.2d 1089 (1989); *Nichols* v. *Warren,* 209 Conn. 191, 203, 550 A.2d 309 (1988). I do not usually string cite, but feel compelled to do so in this case since the majority erroneously places such great weight on the defendant's interpretation.[2]

The majority also states that the deference to the defendant on the interpretation of the law in this case is greater because the defendant has on one occasion "interpreted § 22a-432 to hold an innocent landowner liable to abate a polluted condition on his land." This sole circumstance cannot be sufficient for this court to turn our judicial function over to the executive branch of government.

---

[2] The defendant argues that the trial court improperly substituted its judgment for that of the agency as to the weight of the evidence on questions of *fact* only. The majority, however, concludes that the trial court failed to afford proper deference to the agency's construction of General Statutes § 22a-432, even though the defendant does not challenge the trial court's failure to defer regarding statutory interpretation.

Moreover, we have held that since the term "maintain" is not defined by the legislature, we must assess its meaning " 'according to the commonly approved usage of the language.' " *Aaron* v. *Conservation Commission,* 183 Conn. 532, 548, 441 A.2d 30 (1981); General Statutes § 1-1. I agree that the word maintain may have varying meanings, but all the definitions have one thing in common—that is, some action or positive conduct. See majority opinion p. 375.

The majority opinion is contrary to our own precedent. We have consistently held, in the context of environmental law and within the same statutory title, that the word "maintenance" requires some conduct on the part of the individual. *Aaron* v. *Conservation Commission,* supra, 549.[3] Likewise, in *Anderson* v. *Bradley,* 23 Conn. Sup. 87, 89, 177 A.2d 227 (1961), the word maintain was used to connote some action on the part of the person.[4]

Nevertheless, even if we conclude that maintenance is susceptible to two constructions "one of which would have an absurd consequence, a legislative intent to attain a rational result may be assumed." *Hartford Electric Light Co.* v. *Water Resources Commission,* 162 Conn. 89, 103, 291 A.2d 721 (1971). We do not leave our common sense at home when interpreting a stat-

---

[3] In *Aaron* v. *Conservation Commission,* 183 Conn. 532, 441 A.2d 30 (1981), the plaintiff claimed that a septic system was exempt from regulation under General Statutes § 22a-40 (a) (4) because it was " 'incidental for the enjoyment and maintenance of residential property.' " This court defined "maintenance" as " 'the labor of keeping something . . . in a state of repair or efficiency.' " Id., 549.

[4] In *Anderson* v. *Bradley,* 23 Conn. Sup. 87, 177 A.2d 227 (1961), the defendants purchased property that contained a covenant that required owners to "keep and maintain" a dam located on the premises. The dam was later destroyed in a flood and the plaintiffs sought a decree ordering the defendants to rebuild the dam to its former height. The court found that the words "keep" and "maintain" required the defendants to take action to prevent the dam from gradually deteriorating, although it did not include a duty to reconstruct or restore the dam. Id., 89.

ute. "As Justice Holmes put it in *Roschen* v. *Ward*, 279 U.S. 337, 339, 49 S. Ct. 336, 73 L. Ed. 722 (1929): '[T]here is no canon against using common sense in construing laws as saying what they obviously mean.' " *State* v. *Roque*, 190 Conn. 143, 153, 460 A.2d 26 (1983).

Furthermore, although I agree that the legislature intended to abate pollution and protect our water, that sentiment alone does not indicate that the legislature intended to hold innocent landowners personally liable beyond the value of the land. The majority's discussion regarding the water pollution "crisis" is totally irrelevant.

Finally, I also disagree with the majority's analysis regarding the law of nuisance. In the Mianus Bridge case, we made it absolutely clear that the state of Connecticut could not maintain an action for public nuisance absent intentional conduct on the part of the defendant. *State* v. *Tippetts-Abbett-McCarthy-Stratton*, 204 Conn. 177, 183, 527 A.2d 688 (1987). In the context of the law of nuisance, we have held that intentional means "not that a wrong or the existence of a nuisance was intended but that the creator of them intended to bring about the conditions which are in fact found to be a nuisance." *Beckwith* v. *Stratford*, 129 Conn. 506, 511, 29 A.2d 775 (1942). There was no such intentional conduct on the part of the plaintiff in this case.

Furthermore, the Restatement (Second) of Torts is instructive. Section 839 places on the possessor of land the obligation to abate an artificial condition that constitutes a nuisance. The scope of the possessor's duty is "not an absolute duty to prevent harm to others at all costs, but merely a duty to do what is practicable and reasonable under the circumstances. . . . If he does take the action [to abate the unnatural condition] but it proves insufficient to stop or prevent the condi-

tion from causing harm, he may or may not be liable depending on whether the action that he took was reasonable under the circumstances." 4 Restatement (Second), Torts § 839, comment (e). For an innocent landowner to be held liable for costs of abatement beyond the value of the land is not reasonable.

It is an " 'elementary rule of statutory construction that we must read the legislative scheme as a whole in order to give effect to and harmonize all of the parts.' " *Connecticut Light & Power Co.* v. *Department of Public Utility Control*, 216 Conn. 627, 636, 583 A.2d 906 (1990). The statutory scheme is clear—the legislature intended to hold persons who have intentionally caused pollution liable for the full extent of damage. The legislature did not intend to hold innocent landowners liable beyond the value of their land, but instead intended to have the defendant contract to do the cleanup and place a lien on the property pursuant to §§ 22a-451 and 22a-452a.

The majority opinion will place enormous costs not only on property owners, but also on the financial market. A significant portion of the state's land and landowners may be affected by this decision. The majority's interpretation of § 22a-432 may have a large impact on landowners because significant parts of greater Hartford, Bridgeport and New London are located over groundwater that may be problematic.[5] It could have

[5] "[A]ccording to the DEP's 1987 Water Quality Classifications Map of Connecticut, large parts of the Greater Hartford, New Haven, Bridgeport, and New London metropolitan areas are located over groundwaters classified as GB or GC. A classification of GB means that the water 'may not be suitable for direct human consumption due to waste discharges, spills or leaks of chemicals or land use impacts' . . . . A classification of GC means that discharges to the groundwaters are permitted and 'the historic waste disposal practices may have, for all practical purposes, permanently rendered the groundwater unsuitable for drinking water without treatment.' " Amicus brief of the Connecticut Bankers Association and the Banks' Association of Connecticut p. 4.

a devastating effect on the ability of individuals to purchase homes. Sound public policy requires that we interpret "maintain" to require some conduct on the part of the landowner.

Accordingly, I respectfully dissent.